**DIRECTOR OF the OFFICE OF THRIFT SUPERVISION, U.S. DEPARTMENT OF TREASURY, Plaintiff–Appellant,**

v.

**Pedro R. LOPEZ, Teresa Saldise, Ramon Lopez, Defendants–Appellees.**

**No. 91–6019.**

United States Court of Appeals, Eleventh Circuit.

May 18, 1992.

See also 141 F.R.D. 165.

Geraldine R. Gennet, Aaron B. Kahn, Laurie Romanowich, Miami, Fla., for plaintiff-appellant.

Marc Cooper, Cooper, Wolfe & Bolotin, P.A., Miami, Fla., for defendants-appellees.

G. Richard Strafer, Quinon, Strafer & Scola, Miami, Fla., for Pedro R. Lopez.

Addison J. Meyers, Anderson, Moss & Parks, P.A., Miami, Fla., for Ramon Lopez.

Before KRAVITCH and DUBINA, Circuit Judges, and RONEY, Senior Circuit Judge.

DUBINA, Circuit Judge:

The Director of the Office of Thrift Supervision, United States Department of the Treasury (the "OTS"), appeals the district court's order denying its application for a preliminary injunction to freeze the assets of Pedro Lopez, Teresa Saldise and Ramon Lopez (referred to individually or collectively as the "Lopezes"). The OTS acted pursuant to section 8(i) of the Federal Deposit Insurance Act, as amended by section 2521(b)(1) of the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990, Pub.L. No. 101–647, 104 Stat. 4864 (1990) (the "Bank Fraud Act"), codified at 12 U.S.C. § 1818(i)(4)(B) (1991); *see also* H.R.Rep. No. 101–681(I), 101st Cong. 2nd Sess., reprinted in 1990 U.S.C.C.A.N. 6472, 6585.[1] For the reasons which follow, we reverse.

## I. FACTS AND PROCEDURAL HISTORY

Pedro Lopez was chairman of the board of General Bank, a federal savings bank

---

1. In 1990, Congress passed the Bank Fraud Act as part of on-going legislation designed to stem the burgeoning problems of the savings and loan industry. The Bank Fraud Act enhanced the power of federal banking regulating and law enforcement agencies to combat criminal activity in the banking industry. In 12 U.S.C. § 1818, Congress empowered the OTS to determine, subject to judicial review, whether violations occurred and what, if any, civil penalties to impose. The OTS is further empowered to seek prejudgment attachments in federal court to prevent transfer or dissipation of assets pending final resolution of any administrative enforcement actions. *See* 136 Cong.Rec. E3684 (daily ed. November 2, 1990).

headquartered in Miami, Florida. Teresa Saldise, his spouse, was also a General Bank director. In August 1982, General Bank converted from mutual to stock ownership. At that time, Pedro Lopez and Teresa Saldise jointly purchased an 8,718–share block of General Bank stock equal to 4.9 percent of General Bank's outstanding shares. Ramon Lopez, the father of Pedro Lopez, purchased an identical block. In 1985, Pedro Lopez and Teresa Saldise acquired more General Bank stock, increasing their disclosed holdings to approximately 24.8 per cent of General Bank's outstanding stock. In November of 1989, the OTS appointed the Resolution Trust Corporation (the "RTC") as conservator of General Bank. Soon thereafter, the RTC removed Pedro Lopez and Teresa Saldise as directors of General Bank.

On May 3, 1991, the OTS issued a Notice of Assessment of Civil Money Penalty (the "Notice") against the Lopezes.[2] In the Notice, the OTS charged the Lopezes with acquiring more General Bank stock than was legally permissible. Specifically, the OTS alleged that Pedro Lopez and Teresa Saldise wrongfully acquired more than five percent of the total shares offered by General Bank when it converted from mutual to stock ownership, in violation of 12 C.F.R. § 563b.3 (the "Conversion Regulations").[3] The OTS further alleged that Pedro Lopez

and Teresa Saldise illegally obtained control of General Bank by acquiring more than 25 percent of its stock without regulatory approval, in violation of the Savings and Loan Control Act, 12 U.S.C. § 1730(q) (1982) (the "Control Act")[4] and the regulations[5] promulgated thereunder. The OTS alleged that the illegal stock acquisitions enabled Pedro Lopez and Teresa Saldise to exercise secret control of General Bank in a manner which caused millions of dollars in losses to General Bank. The Notice informed Pedro Lopez and Teresa Saldise that the OTS sought $27,772,500 in civil money penalties in connection with their alleged wrongdoing.

The Notice also alleged that Ramon Lopez violated the Conversion Regulations by secretly acquiring more than five per cent of General Bank's stock when it converted from mutual to stock ownership. The OTS sought $1,322,500 in civil money penalties from Pedro Lopez based on that alleged conversion violation.[6]

Central to the OTS' charges was the allegation that the Lopezes hid improper stock acquisitions through a fraudulent scheme involving nominee shareholders. The OTS alleged that the Lopezes surreptitiously bought General Bank stock and then registered it in the names of nominee shareholders.

The Lopezes requested an administrative hearing, and the matter is now pending before the OTS.

---

**2.** A Notice of Assessment is a formal notification of an assessment of civil penalties for violation of United States banking laws. It is sent pursuant to the authority conferred by 12 U.S.C. § 1817(j)(16) and Section 8(i) of the Federal Deposit Insurance Act, as amended by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1818(i). The Notice gives the recipient an opportunity to request an administrative hearing at which he or she may present evidence and testimony.

**3.** The Conversion Regulations govern the conversion process. They state, in relevant part:
the number of shares which any person together with any associate or group of persons acting in concert may subscribe for or purchase in the conversion shall not exceed five percent (5%) of the total offering of shares....

12 C.F.R. § 563b.3(c)(7)

**4.** The Control Act prohibits any person from obtaining "control" of an insured institution without prior regulatory approval. "Control" is defined as
the power, directly or indirectly, to direct the management or policies of an insured institution or to vote 25 per centum or more of any class of voting securities of an insured institution.
12 U.S.C. § 1730(q)(8)(B).

**5.** 12 C.F.R. §§ 563.18–2 (1983) and 574.3 (1986).

**6.** As part of its formal investigation, the OTS sought to depose Ramon Lopez. However, Ramon Lopez refused to answer any questions as to his relationship with General Bank based on his assertion of his Fifth Amendment privilege.

The OTS brought suit in district court under 12 U.S.C. § 1818(i)(4) [7] for a preliminary injunction to freeze the Lopezes' assets pending the administrative hearing. The district court granted an *ex parte* order freezing the Lopezes' assets the next day. The district court held a hearing and, thereafter, vacated the asset freeze as to Ramon Lopez. The district court extended the freeze for ten days as to Pedro Lopez and Teresa Saldise. It then referred the case to a United States magistrate judge who conducted a two-day preliminary injunction hearing. The magistrate judge's Report and Recommendation concluded that the OTS failed to establish a prima facie case against the Lopezes and recommended denial of OTS' request for prejudgment attachment. The district court

adopted the magistrate judge's report and dismissed the action. This appeal followed.

## II. STANDARD OF REVIEW

■ The Bank Fraud Act authorizes district courts to grant an OTS request for prejudgment attachment upon a prima facie showing of illegality. 12 U.S.C. § 1818(i)(4)(B); *see Commodity Futures Trading Com. v. Muller,* 570 F.2d 1296, 1300 (5th Cir.1978). We review a district court's denial of a request for prejudgment attachment under 12 U.S.C. § 1818(i)(4)(B) for abuse of discretion. 12 U.S.C. § 1818(i)(4)(B); *Muller,* 570 F.2d at 1300.[8] However, whether a plaintiff has made out a prima facie case is a question of law, subject to plenary review. *See Hill v. Met-*

---

**7.** 12 U.S.C. § 1818(i)(4) states in pertinent part:

(4) Prejudgment Attachment

(A) In General

In any action brought by an appropriate Federal banking agency ... pursuant to this section, or in actions brought in aid of, or to enforce an order in, any administrative or other civil action for money damages, restitution, or civil money penalties brought by such agency, the court may, upon application of the agency, issue a restraining order that—

(i) prohibits any person subject to the proceeding from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property ...

(B) Standard

A permanent or temporary injunction or restraining order shall be granted without bond upon a prima facie showing that money damages, restitution, or civil money penalties, as sought by such agency, is appropriate.

**8.** 12 U.S.C. § 1818(i)(4)(B) codifies the Fifth Circuit's opinion in *Muller;* 136 Cong.Rec. E3686 (Daily ed. Nov. 2, 1990). In *Muller,* the Commodity Futures Trading Commission sought and obtained a preliminary injunction enjoining a commodity option firm employee from dissipating his assets pending resolution of the case against him. The *Muller* court stated:

It has long been recognized that in an action brought to enforce the requirements of remedial statutes such as [the Commodity Futures Trading Commission] Act, a district court has broad discretion to fashion appropriate relief. 570 F.2d at 1300.

While 12 U.S.C. § 1818(i)(4)(B) states that a "permanent or temporary injunction or restraining order *shall* be granted without bond upon a prima facie showing that money damages ... [are] appropriate (emphasis supplied)," Supreme Court precedent suggests that use of the word "shall" with reference to an equitable deci-

sion does not eliminate all discretion. *See Califano v. Yamasaki,* 442 U.S. 682, 694 n. 9, 99 S.Ct. 2545, 2554 n. 9, 61 L.Ed.2d 176 (1979) (citing *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944)). In *Bowles,* the Supreme Court examined the Emergency Price Control Act of 1942 which provided that in certain circumstances "a permanent or temporary injunction, restraining order, or other order *shall* be granted without bond." (Emphasis supplied.) The Court, however, concluded "that 'shall be granted' is less mandatory than a literal reading might suggest." *Bowles,* 321 U.S. at 328, 64 S.Ct. at 591. Noting that equity is "the instrument for nice adjustment and reconciliation between the public interest and private needs," the Court determined that "if Congress had intended to make such a drastic departure from the traditional notions of equity practice, an unequivocal statement of its purpose would have been made." *Id.* at 329, 64 S.Ct. at 591. Thus, because 12 U.S.C. § 1818(i)(4)(B) lacks the clear legislative command required by the Supreme Court, we do not interpret Congress' use of the word "shall" to strip the district court of all discretion. We do note, however, Congress' clear intent that the plethora of new banking laws be strictly enforced. *See* 136 Cong. Rec. E3684 (daily ed. November 2, 1990) (extended statement of Rep. Schumer) (Bank Fraud Act enacted to put to justice those who have, through criminal activity and grossly excessive behavior, defrauded the savings and loan industry, leading to its dramatic decline). Therefore, we find that while district courts retain discretion to order prejudgment attachment of assets upon a prima facie showing of illegality, such orders should ordinarily ensue upon such a showing. *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311, 102 S.Ct. 1798, 1802, 72 L.Ed.2d 91 (1982) (Congress may intervene and guide or control the exercise of the courts' discretion.).

*ropolitan Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1538 (11th Cir.1988).

## III. ANALYSIS

The district court denied the requested injunction because it found that the OTS had failed to make out a prima facie case of illegality. We disagree.

■ Section 8(i) of the Bank Fraud Act provides that in actions where the OTS seeks prejudgment attachment, the district court shall issue an order of attachment "upon a prima facie showing that money damages, restitution, or civil money penalties as sought by [the] agency is appropriate." 12 U.S.C. § 1818(i)(4)(B). A prima facie case is established if the evidence presented is sufficient to withstand a motion for a directed verdict. *See Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir.1990). A directed verdict is permissible only when, without weighing witness credibility, the facts and inferences point so strongly and overwhelmingly in favor of one party that a reasonable trier of fact could have but one conclusion. *Johns v. Jarrard*, 927 F.2d 551, 557 (11th Cir.1991); *American Sav. & Loan Assn. v. Pembroke Lakes Regional Center Assoc., Ltd*, 908 F.2d 885, 888 (11th Cir.1990). The court must view the evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Jarrard*, 927 F.2d at 557. In so doing, the court may not weigh the evidence presented, but instead must determine whether any credible evidence has been proffered by the non-moving party. *Id.*

### A. *The Evidence Presented*

The crux of this action rests on the OTS' charges that (1) in 1982, the Lopezes acquired more than five percent of General Bank's stock, in violation of the Conversion Regulations, and (2) in 1985, Pedro Lopez and Teresa Saldise acquired more than 25 percent of General Bank's stock, in violation of the Control Act. The OTS asserts that after purchasing permissible amounts of stock, the Lopezes purchased additional stock surreptitiously by registering it in the names of nominee shareholders, there-by contravening federal statutes and regulations.

To support these charges, the OTS introduced the following evidence forming the gravamen of its case. OTS Federal Thrift Regulator Albert Reyes ("Reyes") testified as to his examination of General Bank's records. Evidence introduced through his testimony included (1) a General Bank stock ledger listing the names of the alleged nominee shareholders; (2) Reyes' testimony that Teresa Saldise had asked permission to use her sister's name to purchase stock; and (3) a series of checks written on accounts allegedly controlled by the Lopezes in payment for General Bank stock.

The General Bank stock ledger contained the names of all General Bank stockholders, the amounts of stock purchased, and the price paid for the stock. Reyes testified that the ledger sheet aroused his suspicion because the last page contained a segregated list of stockholders, most of whom had purchased identical 8,718–share blocks on the same day, August 20, 1982. Each block equalled 4.9 percent of all General Bank stock and cost $50,128.50. The list included the names of the Lopezes, and indicated that Pedro Lopez and Teresa Saldise, jointly, and Ramon Lopez, individually, bought identical 8,718–share blocks of General Bank stock.

The list further indicated that Amie Behar ("Behar"), the sister of Teresa Saldise, also bought an 8,718–share block of General Bank stock for $50,128.50. However, Reyes testified that in March of 1990, Behar told him she was not a General Bank stockholder and that Teresa Saldise had asked for permission to use Behar's name to purchase stock. Reyes testified as follows:

THE COURT: All right. Mr. Reyes, the conversation you had with Miss Behar, would you relate to the Court the circumstances under which it occurred, please.

THE WITNESS [Examiner Reyes]: Sure. I was basically—at the time I was having a change, personal change in my insur-

ance policy. Miss Behar handled [my] account ...

\* \* \* \* \* \*

Q. By Mr. Levin [OTS counsel]: All right. You were working in March of 1990 ... at General Bank?

A. Yes, I was.

Q. And you had a conversation with Amy [sic] Behar at the insurance agency?

A. Yes I did.

Q. And, now, could you please recount that conversation.

A. Again, as I previously explained, I was changing over insurance.... I went in, sat down, talked to Amy [sic], went ahead and started setting up the actual insurance, the account, went through the questions, you know, your address and everything forward, at which point we came to what do you do, where are you employed and then when I expressed that I was an [OTS] examiner ... she made a side comment that, you know, I had some family members that they're in the banking business, or something to that effect, and I said, really ..., I'm working right down the street at General Bank and she said really, I have a family member and she mentioned Teresa Saldise that worked there and her husband also, Pedro Ramon Lopez.

\* \* \* \* \* \*

Q. And what did you do next?

A. I headed back to General Bank and then I had her business card ... and the name just rung a bell. ... [W]hen I got back to the bank and sat down, I went through the loan file to see if she had a loan there ... I had a stockholder's list also—and I went through the stockholder's list and there was Amy's [sic] name.

\* \* \* \* \* \*

Q. And then what did you do next, please?

A. Okay. Like I said, I went through and I saw Amy's [sic] name on there and I just found it kind of curious that she hadn't mentioned that she was a stockholder after telling me that her family was involved in the bank.

\* \* \* \* \* \*

I [telephoned Behar and] said, aren't you a stockholder in General Bank and she replied, "No." And she ... asked me why and I said, well, because I was looking through a stockholder's list here and ... you're listed as a stockholder at General Bank, and she says, well, no no, I'm not a stockholder.

Then if I recall right, there was a pause and she said, well, I think one time my sister [Teresa Saldise] asked me if she could use my name or something like that to purchase the stock.

Record of hearing, volume III—31, 34–36, 39–40.

The OTS also introduced a series of checks written on accounts allegedly controlled by the Lopezes in payment for General Bank stock. Reyes testified that the checks aroused suspicion for several reasons. First, two of the checks were drawn from accounts maintained by "Lopez and Saldise," a law firm wholly owned by Teresa Saldise in which Pedro Lopez had been her partner since 1979. Both checks were used to buy General Bank stock. The first was for $100,000 and was drawn from the Lopez and Saldise law firm's office account. The other check was drawn on the firm's trust account for $189,321.50. Second, several of the remaining checks were written on accounts maintained by various optical companies, including Ray Optical, Lopez Optical and Discount Optical. Reyes stated that members of the Lopez family controlled those firms, although he could not be more specific. Reyes also testified that, according to the stock ledgers, no optical companies owned General Bank stock. However, the check from Discount Optical Corporation, payable for $100,000 of General Bank stock, was signed by Ramon Lopez. Last, Reyes testified that Ramon Lopez had an ownership interest in Ray Optical in 1982, although, to what extent he could not be sure.

## B. *The OTS' Prima Facie Case*

The above evidence, unrebutted by the Lopezes [9], formed the crux of the OTS' case against them.[10] Viewing it in its totality and in the light most favorable to the OTS, we find it sufficient to establish a prima facie case of illegality against the Lopezes.

### 1. *Pedro Lopez and Teresa Saldise*

The OTS proved that Pedro Lopez and Teresa Saldise jointly acquired 4.9 percent of General Bank stock in 1982, and 24.8 percent by 1985. Thus, to establish its prima facie case the OTS needed only demonstrate that in 1982 Pedro Lopez and Teresa Saldise enjoyed beneficial ownership of $\frac{1}{10}$ of one percent more stock than they admitted to owning and, as to 1985, that they beneficially owned more than $\frac{2}{10}$ of one percent more stock than they admitted to owning.

■ The proffered evidence is sufficient to support these inferences. First, the bank ledger established that Behar owned 4.9 percent of general bank's stock. However, Behar told OTS investigator Reyes that she did not own General Bank stock. According to Reyes testimony, Behar stated that Teresa Saldise asked Behar for permission to buy General Bank stock in Behar's name. The Lopezes contested this evidence on hearsay grounds, but once admitted, it stood unchallenged.[11] This direct evidence of a fraudulent scheme to acquire stock employing nominee shareholders goes to the very core of the OTS' allegations against Pedro Lopez and Teresa Saldise.

Furthermore, equally compelling is the 1982 check drawn from the Lopez and Saldise law firm's office account in payment for General Bank stock. The check was for $100,000; yet, the stock ledger reveals that Pedro Lopez and Teresa Saldise bought only $50,128.50 worth of General Bank stock—$\frac{1}{10}$th of one percent less than the maximum legal amount at that time. The nearly $50,000 differential in what was paid for versus what was purportedly received leads to a reasonable inference that Pedro Lopez and Teresa Saldise paid for—and thus owned—stock not registered in their names. Moreover, this same logic applied to their 1985 acquisitions leads to the same conclusion. In 1985, Pedro Lopez and Teresa Saldise owned 24.8 percent of General Bank's outstanding shares—only $\frac{1}{10}$th of one percent less than permitted by the Control Act. The above evidence permits the reasonable conclusion that Pedro Lopez and Teresa Saldise bought stock not registered in their names, thus taking their holdings beyond the legal threshold. Reyes' testimony about Behar supports the OTS' claim that excess stock was hidden amid the shell holdings of nominee shareholders. This evidence, taken in its totality and in the light most favorable to the OTS, leads to the reasonable infer-

---

9. Although given the opportunity to present witnesses and evidence by the magistrate judge, the Lopezes declined to do so.

10. The district court excluded additional evidence proffered by the OTS. This evidence included the appearance and in-court testimony of one of the alleged nominee shareholders, who, according to the OTS' proffer, agreed to testify as to his/her status as a nominee shareholder. The district court refused to hear this direct evidence because the witness did not appear on the OTS' prehearing witness list. Moreover, the OTS proffered, and the district court refused to allow, evidence which included the alleged nominee shareholders' tax returns. The OTS offered this evidence to demonstrate that the alleged nominees were not the true owners of General Bank stock because the tax returns would show the alleged nominees' failure to take tax deductions for losses from their General Bank stock—losses ranging from $43,000 to over $50,000 per nominee.

11. While this evidence is technically hearsay, and therefore inadmissible, OTS regulations do not require evidence to conform to the requirements of the Federal Rules of Evidence. Rather, the evidence need only be "relevant, material, reliable, and not unduly repetitive." 12 C.F.R. § 509.36(a)(3), 56 Fed.Reg. 38315 (August 12, 1991). This standard is consistent with well-settled principles that the Federal Rules of Evidence do not apply in administrative hearings. *See Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (hearsay may be admissible in administrative proceedings); *accord Williams v. United States Dept. of Transp.*, 781 F.2d 1573, 1578 n. 7 (11th Cir. 1986). Accordingly, we are persuaded that the district court properly admitted this testimony.

ence that Pedro Lopez and Teresa Saldise employed nominee shareholders to purchase stock beyond their legal entitlement.

### 2. *Ramon Lopez*

Ramon Lopez also acquired 4.9 percent of General Bank's stock in 1982. Thus, the OTS needed only establish that Ramon Lopez acquired subsequent beneficial ownership of $\frac{1}{10}$ of one percent of General Bank's stock. We are persuaded that the OTS has met its burden.

 One of the checks entered into evidence was drawn on the account of Discount Optical Corporation in payment for General Bank stock. That $100,000 check was signed by Ramon Lopez. While the testimony tying Ramon Lopez to Discount Optical Corporation was meager, we find that testimony, combined with Ramon Lopez's signature on the check, sufficient to support the reasonable inference that Ramon Lopez had an ownership interest in Discount Optical Corporation. As with Teresa Saldise and Pedro Lopez, the check signed by Ramon Lopez far exceeded the amount necessary to purchase the 4.9 percent of General Bank stock to which he admitted to owning. This evidence is sufficient to give a colorable inference that Ramon Lopez bought more stock than legally permissible. Moreover, an adverse inference may be drawn from Ramon Lopez's refusal to answer questions about his relationship with General Bank. While this refusal may not be used as the sole basis of a prima facie case, it may nonetheless be used in conjunction with other evidence to establish a prima facie case. *See Baxter v. Palmigiano*, 425 U.S. 308, 318–19, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976) (adverse inference may be drawn against parties to civil actions when they refuse to testify). The evidence against Ramon Lopez, taken as a whole and in the light most favorable to the OTS, is sufficient to support a prima facie case against him.

### IV. CONCLUSION

 The record demonstrates that the OTS met its burden of establishing a prima facie case of illegality against the Lopezes.

Accordingly, we reverse the district court as to this issue. However, because the district court's finding precluded it from exercising its discretion as to the award of injunctive relief, we remand to the district court for a determination whether the requested injunction should ensue.

REVERSED AND REMANDED.