**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

Nos. 93-2944 & 94-20013

---

BOARD OF GOVERNORS OF THE FEDERAL
RESERVE SYSTEM,

                                        Plaintiff-Appellee,

                    versus

DLG FINANCIAL CORP. and
DANIEL S. DE LA GARZA

                                        Defendants-
Appellants.

---

Appeals from the United States District Court
For the Southern District of Texas

---

C\W

No. 94-10078

DLG FINANCIAL CORPORATION and
DANIEL S. DE LA GARZA,

                                        Plaintiffs-
Appellants,

                    versus

FEDERAL RESERVE SYSTEM OF THE UNITED
STATES, BOARD OF GOVERNORS, FEDERAL
RESERVE BANK OF DALLAS and THE FEDERAL
DEPOSIT INSURANCE CORPORATION,

                                        Defendants-
Appellees.

---

Appeal from the United States District Court
for the Northern District of Texas

(August 15, 1994)

Before GOLDBERG, KING, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

These consolidated appeals stem from two separate actions, one filed in the federal district court for the Northern District of Texas (hereafter the Dallas Court), and the other filed in the federal district court for the Southern District of Texas (hereafter the Houston Court). In the Dallas action, Appellants DLG Financial Corporation ("DLG") and Daniel S. De La Garza ("De La Garza") appeal the Dallas Court's decision to dismiss various state and federal claims they brought against the Board of Governors of the Federal Reserve System ("Board"), the Federal Reserve Bank of Dallas ("FRBD"), and the Federal Deposit Insurance Corporation ("FDIC"). As we conclude that these claims are precluded by the Federal Deposit Insurance Act ("FDIA"), the Federal Tort Claims Act ("FTCA"), and the Tucker Act, we affirm the dismissal of these claims.

In the Houston action, DLG and De La Garza appeal the Houston Court's issuance of a restraining order and a preliminary injunction, pursuant to FDIA § 1818(i)(4), that encumbered certain of their assets. Finding the restraining order to be unappealable, we dismiss the appeal of that order. With respect to the appeal of the preliminary injunction, we conclude that DLG and De La Garza were afforded due process and that the Board made the requisite showing; we therefore affirm the Houston Court's order granting injunctive relief.

2

FACTS AND PROCEEDINGS

DLG is a company engaged in the business of buying discount promissory notes and other assets of failed commercial entities and reselling them at a profit.  De La Garza is the president, CEO, and sole shareholder of DLG.  On October 30, 1990, DLG entered into a letter agreement to purchase two promissory notes from NCNB Texas National Bank, N.A., which was acting on behalf of the FDIC.  These notes were executed by International Bancorporation, Inc. ("IBI") and were secured by a pledge of all outstanding common stock of International Bank, N.A.  The security agreement provided that if the notes came into default the noteholder could exercise all of the voting rights and corporate powers concerning the pledged stock without having to foreclose on the notes.

Between the execution of the letter agreement and the acquisition of the promissory notes by DLG, the relationship between the parties grew contentious.  Ultimately, DLG and De La Garza were forced to sue the FDIC to compel performance under the letter agreement.  On March 17, 1992, pursuant to a settlement agreement, DLG acquired the promissory notes for $1,000,000.  At the time of acquisition, the notes were already in default.

Shortly after DLG obtained the notes from the FDIC, another fiscal agency of the federal government, the FRBDSQthe entity that supervises bank holding companies in Texas on behalf of the BoardSQwrote to DLG stating that its purchase of the promissory notes and the concomitant acquisition of bank voting rights

appeared to violate the Bank Holding Company Act ("BHCA"),[1] which, inter alia, generally prohibits an entity from becoming a bank holding company without obtaining prior approval from the Board.[2] The letter from the FRBD instructed DLG to file immediately either (1) an application for approval to acquire the notes or (2) a divestiture plan.[3]

DLG and De La Garza, however, insist that DLG did not become a bank holding company by purchasing the notes, and therefore prior Board approval was not required. Accordingly, they responded to the letter from the FRBD by turning to the courts.

A.   The Dallas Action

On October 9, 1992, DLG and De La Garza filed suit in the Dallas Court against the Board, the FRBD, and the FDIC. In this action, DLG and De La Garza sought declaratory and injunctive relief to (1) establish their rights with respect to the promissory notes, (2) prevent interference with those rights, and (3) preclude the Board from asserting jurisdiction over DLG as a bank holding company under the BHCA. DLG and De La Garza also sought monetary

---

[1] 12 U.S.C. §§ 1841-1850 (1988 & Supp. III 1991).

[2] Section 1842(a)(1) of the BHCA prohibits an entity from becoming a bank holding company without obtaining prior approval of the Board. In general, a bank holding company is any company that has control over a bank. Id. § 1841(a)(1). One way that a company can control a bank is to own, control, or have the power to vote 25% or more of any class of voting security of a bank, whether directly, indirectly, or acting through one or more other persons. Id. § 1841(a)(2)(A).

[3] DLG and the FRBD later agreed that within 60 days DLG would sell the notes, obtain Board approval, or file a new divestiture plan.

4

damages and attorney's fees for breach of contract, tortious interference with contract, tortious interference with prospective contractual and business relations, fraud, conspiracy to commit fraud, and violations of the Due Process Clause of the Fifth Amendment.

On March 30, 1993, the Dallas Court dismissed DLG's and De La Garza's claims for declaratory and injunctive relief, reasoning that such relief was explicitly precluded by 12 U.S.C. § 1818(i)(1). As for the monetary claims, the court dismissed (1) DLG's and De La Garza's state-law tort claims against the Board and the FDIC, holding that such claims must be brought against the United States pursuant to the Federal Tort Claims Act ("FTCA")[4]; (2) a constitutional takings claim against the Board, finding that the Tucker Act granted the Court of Federal Claims exclusive jurisdiction over such an action[5]; (3) a motion to dismiss a takings claim against the FDIC[6]; and (4) a breach of contract claim against the FDIC, but granted an opportunity to replead. DLG and De La Garza amended their complaint, but, late in 1993, voluntarily dismissed all remaining claims and filed this appeal.

In May 1993, IBI redeemed the promissory notes for $2,000,000.

---

[4] 28 U.S.C. §§ 2671-2680 (1988 & Supp. III 1991).

[5] 28 U.S.C.A. § 1491(a)(1) (West 1994). The district court denied a motion to dismiss without prejudice Appellants' state-law tort and constitutional claims against the FRBD, declining to decide whether the FTCA or the Tucker Act applied to that entity. Subsequently, appellants voluntarily dismissed these claims.

[6] Appellants voluntarily dismissed takings claims against the other defendants.

5

De La Garza instructed IBI to wire the payment to a recently formed entity headed by his wife, Southwest Underwood Company, which had no previous connection with the promissory note transaction.

On September 22, 1993, a state grand jury sitting in Travis County, Texas returned an indictment charging De La Garza and others with misapplication of approximately $9,000,000 in insurance company assets.[7]  This indictment and De La Garza's decision to have the proceeds of the sale of the notes wired to Southwest Underwood Company precipitated, in part, the Board's decision to commence litigation in the Houston Court.

B.    The Houston Action

In October 1993, pursuant to its authority under the Federal Deposit Insurance Act ("FDIA"),[8] the Board commenced an administrative proceeding against DLG and De La Garza.  In this proceeding, the Board made the same allegation asserted earlier by the FRBD))namely, that the acquisition of the promissory notes made DLG a bank holding company, and therefore the failure to obtain Board approval prior to the purchase of the notes violated the BHCA.  Based on this charge, the Board assessed civil penalties totaling $1,000,000))$500,000 each against DLG and De La Garza[9] but

_____

[7]Of which amount, roughly $900,000 was used for the purchase of the promissory notes that gave rise to this litigation.

[8]Under the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C.A. §§ 1811-1834b (West 1989 & Supp. 1994), the Board has the exclusive authority to commence administrative proceedings for civil penalties and other relief for violations of the BHCA. Id. §§ 1818(b)(3), 1818(i).

[9]See BHCA, 12 U.S.C. § 1847(b)(1) (providing for the imposition of civil fines of up to $25,000 per day against any

provided that the fines were payable only after an opportunity for an adversary administrative enforcement proceeding and the exhaustion of appeals therefrom.

On November 1, 1993, the Board filed a motion in the Houston Court, seeking a restraining order to freeze De La Garza's and DLG's assets to prevent their dissipation.[10] As noted, the Board relied, in part, on De La Garza's alleged "diversion" of the proceeds from the sale of the promissory notes to Southwest Underwood Company, and on his recent indictment for misapplying insurance company assets, as justification for seeking such an order.

Based on the evidence presented by the Board, which included a sworn declaration by an agency official, the court found that the Board had made a prima facie showing that DLG and De La Garza had violated the BHCA and that civil penalties were justified.[11] The

company or person who participates in the violation of the BHCA).

[10]The FDIA empowers the Board to obtain such a restraining order to assist it in its administrative actions. Specifically, § 1818(i)(4)(A) provides that a district court may, "in the aid of . . . any administrative . . . action for . . . civil money penalties . . . issue a restraining order that))(i) prohibits any person subject to the proceeding from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property."

[11]DLG purchased the promissory notes before the effective date of the 1993 amendments to the BHCA. These amendments altered the burden of proof that the Board must meet prior to attaching assets. Compare 12 U.S.C. § 1818(i)(4)(B) (Supp. III 1991) ("A permanent or temporary injunction or restraining order shall be granted without bond upon a prima facie showing that money damages, restitution, or civil money penalties, as sought by such agency, is appropriate.") with 12 U.S.C.A. § 1818(i)(4)(B) (West Supp. 1994) ("Rule 65 of the Federal Rules of Civil Procedure shall apply [to an application for a

court immediately issued an "Order to Show Cause and Temporary Restraining Order," commanding DLG and De La Garza to appear in court on November 3, 1993, and show cause why they should not be enjoined from "withdrawing, transferring, removing, dissipating, or disposing of" their assets ("November 1 Order").  Pending further order of the court, the November 1 Order also prohibited DLG and De La Garza, or any of their employees, from withdrawing, transferring, removing, dissipating, or disposing of any of their assets.  DLG and De La Garza appeal this order.

Two days later, on November 3, 1993, a hearing was conducted by the Houston Court during which it received evidence and heard arguments from both sides.  From the bench Chief Judge Black then orally issued a preliminary injunction ("November 3 Injunction") that substantially modified and limited the November 1 Order, imposing a lien of $1,000,000 on but three among a number of properties owned by DLG.  A slightly modified version of this preliminary injunction was issued in written form on December 23, 1993 ("December 23 Injunction"), replacing the November 3 Injunction entirely.  De La Garza and DLG appeal from the December 23 Injunction.

On March 17, 1994, the district court again modified its injunction, but unlike the December 23 Injunction, this March 17 modification was just thatSQa modificationSQwhich did not supplant the prior injunction.  DLG and De La Garza have appealed the March

restraining order] without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate.").

modification, but the appeal of this modification was not consolidated with the instant appeals and thus is not before us.

II

ANALYSIS

A. The Dallas Action

We address first whether the Dallas Court properly dismissed claims by DLG and De La Garza for declaratory and injunctive relief and monetary damages. We conclude that it did.

1. Declaratory and Injunctive Relief

DLG and De La Garza filed the Dallas action against the Board, the FRBD, and the FDIC, seeking various declaratory and injunctive relief. The Dallas Court dismissed these claims, reasoning that such relief was precluded by § 1818(i)(1) of the FDIA. We agree.

DLG and De La Garza argue that the district court's decision is flawed because, when they filed the Dallas action, there was no ongoing administrative proceeding. We find this argument unavailing.

In essence DLG and De La Garza asked the district court to enjoin the board from continuing its investigation into or bringing an enforcement proceeding against them. Section 1818(i)(1), however, provides that "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice, or order under [this section], or to review, modify, suspend, terminate, or set aside any such notice or order."[12] Accordingly, § 1818(i)(1) divested the district court of

_____

[12]12 U.S.C. § 1818(i)(1). (emphasis added).

9

jurisdiction to enjoin the commencement of the Board's administrative enforcement. The fact that no administrative action was pending when DLG and De La Garza filed the Dallas action is irrelevant to this determination. As this court stated in Groos National Bank v. Comptroller of Currency,[13] "[s]ection 1818 as a whole provides a detailed framework for regulatory enforcement and for orderly review of the various stages of enforcement; and § 1818(i) in particular evinces a clear intention that this regulatory process is not to be disturbed by untimely judicial intervention, at least where there is no `clear departure from statutory authority.'"[14]

### 2. Claims for Monetary Damages

The Dallas Court dismissed state-law tort claims against the Board and the FDIC. This judgment was proper, as such claims must be brought against the United States pursuant to the FTCA. DLG's and De La Garza's contention that their state-law tort claims against the FDIC should not have been dismissed because § 1819(a) of the FDIA authorizes the FDIC to "sue and be sued"[15] is feckless. We have noted that, notwithstanding the "sue and be sued" clause of

---

[13]573 F.2d 889, 895 (5th Cir. 1978) (quoting Manges v. Camp, 474 F.2d 97, 99 (5th Cir. 1973)).

[14]Latching onto the last phrase in the quotation above, Appellants argue that we should recognize an exception to the explicit command of § 1818(i)(1) and permit an action to enjoin the Board from acting beyond its statutory authority. In Board of Governors of Federal Reserve System v. MCorp Financial, Inc., 502 U.S. 32, (1991), however, the Supreme Court rejected this very argument and held that a "beyond the Board's statutory authority" exception to § 1818(i)(1) is not available.

[15]See 12 U.S.C. § 1819(a) (Supp. III 1991).

§ 1819(a), the FTCA provides the exclusive avenue for claims cognizable under that Act.[16]

Also correct was the court's dismissal of the takings claim against the Board. The Tucker Act[17] and the Little Tucker Act[18] operate to vest the Court of Federal Claims with exclusive jurisdiction for all constitutional claims against the federal government for money damages exceeding $10,000.[19] Because DLG and De La Garza sought $25,000,000 for the alleged violations of their rights, the district court properly determined that this takings claim must be brought before the Court of Federal Claims. Thus concluding that the Dallas Court properly dismissed the foregoing claims, we next address related proceedings conducted further south, in the Houston federal courthouse.

B.   The Houston Action

We shall consider first whether the Houston Court's November 1 Order is appealable. Next, we shall turn to DLG's and De La Garza's argument that § 1811(i)(4) violated due process. Finally,

---

[16]See Gregory v. Mitchell, 634 F.2d 199, 204 (5th Cir. 1981).

[17]28 U.S.C.A. § 1491(a)(1) (West 1994).

[18]28 U.S.C. § 1346(a)(2) (1988) (granting district courts concurrent jurisdiction for takings claims not exceeding $10,000).

[19]See Preseault v. I.C.C., 494 U.S. 1 (1990); Graham v. Henegar, 640 F.2d 732, 734 (5th Cir. Unit A 1981); see also Bell Atl. Tel. Co. v. FCC, Nos. 92-1619, 92-1620, 93-1028, and 93-1053, 1994 WL 247134, at *6 n.1 (D.C. Cir. June 10, 1994) ("The Tucker Act, 28 U.S.C. § 1491(a)(1), vests exclusive jurisdiction over takings claims that exceed $10,000 in controversy . . . in the United States [Court of Federal Claims].")

11

we shall consider their claim that they were not required to obtain Board approval prior to acquiring the promissory notes.

### 1. The November 1 Order

On November 1, the district court issued an order commanding DLG and De La Garza to appear two days later and show cause why they should not be enjoined from "withdrawing, transferring, removing, dissipating, or disposing of" their assets. The Board urges that this order is not appealable, and we agree. We arrive at our conclusion based on two distinct but related rationales.

First, we find the November 1 Order to be, in substance, an unappealable temporary restraining order ("TRO"). In general, a TRO is not appealable.[20] This is so because, as Judge Tuttle observed, TROs are "usually effective for only very brief periods of time, far less than the time required for an appeal . . . and are then generally supplanted by appealable temporary or permanent injunctions."[21] That is precisely what happened here. Less than two days after its issuance, the November 1 Order evaporated when, upon completion of the show cause hearing, Chief Judge Black orally entered a preliminary injunction that supplanted the TRO. This injunction, as Judge Tuttle might have forecast, subsequently was appealed.

We find unpersuasive the arguments by DLG and De La Garza to

---

[20]In re Lieb, 915 F.2d 180, 183 (5th Cir. 1990) ("This court has long held that the denial of an application for a [TRO] is not appealable."); see 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2962, at 616 (1973).

[21]Connell v. Dulien Steel Prods., Inc., 240 F.2d 414, 418 (5th Cir. 1957), cert. denied, 356 U.S. 968 (1958).

the contrary. They contend that because the November 1 Order had no specific expiration date, it was in substance a preliminary injunction and thus was appealable. Although a TRO with a lengthy duration may be appealable, the two-day term of the November 1 Order clearly was insufficient for any such transmogrification.

Second, mootness interdicts the appeal of the November 1 Order; it became moot when it was superseded by the November 3 Injunction. Thus, since November 3, 1993, DLG and De La Garza have been free of the restraints imposed on them by the November 1 Order. Moreover, because the preliminary injunction was appealed, we need not consider the November 1 Order "to protect the rights of the parties."[22] The rights of the parties were guarded adequately through appeal of the subsequently issued injunctions.

2. Section 1818(i)(4) Comports with Due Process

DLG and De La Garza contend that the Houston Court's November 1 Order and the subsequent injunctions granted by that court were improper, as the provision authorizing the court to encumber assets violated the Due Process Clause of the Fifth Amendment. In particular, they argue that the version of 12 U.S.C. § 1818(i)(4)(A) in effect before December 1993 was unconstitutional in that it required a court to grant injunctive relief without a predeprivation hearing. But, as the statute merely permitted the court to act without a hearing but clearly did not require it to do so, this argument is specious. Moreover, as explained below, a predeprivation hearing was not constitutionally required in this

_____

[22]WRIGHT & MILLER, supra, note 20, § 2962, at 618.

13

case.

### a. Section 1818 Permitted, But Did Not Require, Injunctive Relief Without A Predeprivation Hearing

Section 1818(i)(4)(A) provides that a district court <u>may</u>, "in the aid of . . . any administrative . . . action for . . . civil money penalties . . . issue a restraining order that))(i) prohibits any person subject to the proceeding from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property."  Prior to December 1993, the section also stated that such "[a] permanent or temporary injunction or restraining order shall be granted . . . [only] upon a prima facie showing that . . . civil money penalties . . . [are] appropriate."[23] Although in general statutory schemes use "may" to identify permissive acts and "shall" to identify mandatory acts, in circumstances such as this where "shall" is used with reference to a court's authority to render an equitable decision, the use of "shall" does not eliminate all discretion absent "an unequivocal statement of [congressional] purpose" to do so.[24]  As § 1818(i)(4)(B) lacks such a clear legislative command,[25] "shall" as used in this paragraph thus permitted))but did not require))an injunction to be issued without a hearing.  Moreover, based on the

_____

[23]12 U.S.C. § 1818(i)(4)(B)(i) (Supp. III 1991) (amended 1993).

[24]<u>Hecht Co. v. Bowles</u>, 321 U.S. 321, 329 (1944); <u>Director, OTS v. Lopez</u>, 960 F.2d 958, 961 n.8 (1992).

[25]<u>Lopez</u>, 960 F.2d at 961 n.8 (finding that § 1818(i)(4)(B) did not strip district court of discretion to order prejudgment attachment of assets upon a prima facie showing).

14

facts of this case, a predeprivation hearing was not required.

   b.   A Predeprivation Hearing Was
        Not Constitutionally Required

It is undisputed that § 1818(i)(4) allowed a court to freeze assets, thereby depriving a property interest and triggering the Due Process Clause of the Fifth Amendment.[26]  The parties differ, though, on what process was due.

In general, individuals must receive notice and an opportunity to be heard before the government deprives them of a property interest.[27]  But there are exceptions to the general rule, and the Board maintains that this case provides an example of an "extraordinary situation[] where some valid governmental interest is at stake that justifies postponing the hearing until after the [deprivation]."[28]  In light of Supreme Court authority identifying when such situations exist, we agree.

   i.   Mallen factors

In FDIC v. Mallen,[29] the Supreme Court identified three factors that typically are present in cases in which a postdeprivation hearing is sufficient to satisfy due process:  (1) the action is necessary to further an important governmental interest; (2) there is a need for prompt action; and (3) there is a substantial

---

[26]U.S. CONST. amend. V.

[27]See, e.g., United States v. James Daniel Good Real Property, 114 S. Ct. 492, 498 (1993).

[28]Id. at 501 (quotations omitted).

[29]486 U.S. 230 (1988).

assurance that the deprivation is not baseless or unwarranted.[30] Here, all three factors were present.

First, the government has an important interest in maintaining public confidence in the integrity of financial institutions. In fact, in <u>Spiegel v. Ryan</u>,[31] the Ninth Circuit held that such an interest was sufficiently important to justify ordering a bank official to pay restitution pending an administrative hearing to determine whether a permanent cease and desist order should issue.

Moreover, in <u>Mallen</u> itself, the Court found the government's interest in maintaining public confidence in banking institutions to be of sufficient importance to forego a predeprivation hearing. In that case, the Court upheld the constitutionality of § 1818(g) of the FDIA, which permits the FDIC to suspend from office, without a predeprivation hearing, an indicted bank official if his or her continued service is deemed by the FDIC to pose a threat to the interests of the bank's depositors or to public confidence in the bank. The Court allowed such deprivation to stand despite the absence of a prior hearing, given the importance of taking prompt action to protect depositors and "to maintain public confidence in our banking institutions."[32] We conclude that the Board's interest

---

[30]<u>Id.</u> at 240; <u>see</u> <u>Fuentes v. Shevin</u>, 407 U.S. 67, 91 (1972); <u>see also</u> <u>North Am. Cold Storage Co. v. Chicago</u>, 211 U.S. 306 (1908) (permitting officials to order destruction of putrid poultry before giving notice and an opportunity to be heard because of public health exigency).

[31]946 F.2d 1435, 1440 (9th Cir. 1991), <u>cert. denied</u>, 112 S. Ct. 1584 (1992).

[32]<u>Mallen</u>, 486 U.S. at 241. In <u>Mallen</u>, Justice Stevens noted that such an interest "is certainly as significant as the State's

16

in freezing the assets of DLG and De La Garza was at least as strong as it was in <u>Spiegel</u> and <u>Mallen</u>.[33]

Second, prompt action was necessary. In general, prompt <u>ex parte</u> action is necessary to prevent persons identified in Board administrative actions from dissipating or concealing assets. In the instant case, De La GarzaSQwho had been indicted by a grand jury in Texas for misapplying the assets of an insurance companySQdirected the proceeds from the sale of the promissory notes to the account of a recently formed corporation that had no known prior involvement with the note transaction and of which De La Garza's wife was the president. Those facts provide substantial evidence supporting the need for prompt action.

Third, the deprivation was neither baseless nor unwarranted. Section 1818(i)(4) was drawn to further its stated interest. To obtain an injunction, the Board was required to make a prima facie showing that civil money penalties were appropriate. The Board here made out such a case, submitting to the court the verified statement of Stephen Meyer, who satisfactorily explained the Board's finding that civil money penalties were justified. The Houston Court evaluated this declaration and found that the Board

interest in preserving the integrity of the sport of horse racing, an interest that we deemed sufficiently important in <u>Barry v. Barchi</u>, [443 U.S. 55, 64-65 (1979),] to justify a brief period of suspension prior to affording the suspended trainer a hearing." <u>Id.</u>

[33]Freezing the assets of DLG and De La Garza directly furthers the government's interest in collecting fines that it may, in the future, be entitled to collect and indirectly furthers the government's interest in maintaining the integrity of financial institutions.

had established that civil penalties were warranted. Moreover, both the November 3 and December 23 Injunctions were narrowly tailored to encumber assets having no more aggregate value than was necessary to satisfy the civil penalties in the event of nonpayment. In sum, the three factors that the Mallen Court identified as being required for a postdeprivation hearing to be sufficient to satisfy due process were present here.

### ii. Mathews Balancing

More recent Supreme Court cases support the conclusion that a predeprivation hearing was not required here. In United States v. James Daniel Good Real Property,[34] the Court employed the Mathews v. Eldridge[35] balancing test to determine whether the seizure of real property without notice and without a hearing comported with due process.[36] The factors weighed in the familiar Mathews balancing test are "the private interest affected by the official action; the risk of an erroneous deprivation of that interest through the procedures used, as well as the probable value of additional safeguards; and the government's interest, including the administrative burden that additional procedural requirements would

---

[34]114 S. Ct. 492 (1993).

[35]424 U.S. 319 (1976).

[36]See James Daniel Good Real Property, 114 S. Ct. at 501; see also Connecticut v. Doehr, 501 U.S. 1 (1991) (relying upon the Mathews balancing test to determine the constitutionality of a Connecticut statute that authorized the prejudgment attachment of real estate without prior notice or hearing).

18

impose."[37]   Applying the Mathews test to the instant case demonstrates that due process did not require a predeprivation hearing.

On one side of the scale, the freeze of Appellants' assets unquestionably affected an important property interest.[38]  Also, the risk of an erroneous deprivation was substantial.  The danger of an erroneous deprivation in this case))in which the availability of prejudgment attachment is conditioned on the establishment of a prima facie case))differed little from the risk of an erroneous deprivation present in Doehr.[39]

On the other side of the scale, the government's interest and the presence of exigent circumstances weigh heavily against the need of a predeprivation hearing.  In Doehr, the Court noted that "there was no allegation that Doehr was about to transfer or encumber his real estate or take any other action during the pendency of the action that would render his real estate unavailable to satisfy a judgment."[40]  Significantly, though, the Court explained that "a properly supported claim [that a person was about to transfer or encumber his assets] would be an exigent

---

[37]James Daniel Good Real Property, 114 S. Ct. at 501 (citing Mathews, 424 U.S. at 335).

[38]See Doehr, 501 U.S. at 11 (stating that "the property interests that attachment affects are significant").

[39]See id. at 12 (finding the risk of an erroneous deprivation to be "substantial" where prejudgment attachment could be achieved by showing that there was probable cause to sustain the validity of the plaintiff's claim).

[40]Id. at 16.

19

circumstance permitting postponing any notice or hearing until after the attachment is effected."[41]   In this case, the Board adequately supported its claim that De La Garza was disposed to dissipating his assets by showing that (1) he had been indicted for misapplying assets of an insurance company, and (2) he had ordered that the proceeds from the sale of the promissory notes be delivered to a company controlled by his wife that had no previous involvement in the note transaction.   Thus, under the Mathews balancing test, a postdeprivation hearing was sufficient to satisfy due process in this case.

>        c.    A Postdeprivation Hearing Was Held Promptly

Even when a predeprivation hearing is not required, a "sufficiently prompt" postdeprivation hearing still must be held.[42] Here, the Houston Court met this requirement.   Within two days after the issuance of its restraining order, the court conducted a postdeprivation hearing in which the broad assets freeze was lifted and replaced with a narrowly tailored freeze of barely sufficient collateral real estate.

During this November 3 postdeprivation hearing, DLG and De La Garza were given an opportunity to present evidence to an Article III judge.   After receiving such evidence, the district court orally imposed a preliminary injunction, encumbering only so much of the real property of DLG and De La Garza as was necessary to

---

[41]Id. (citing Fuentes v. Shevin, 407 U.S. 67, 90-92) (1972); Sniadach v. Family Fin. Corp., 395 U.S. 337, 339 (1969)).

[42]See FDIC v. Mallen, 486 U.S. 230, 241 (1988).

cover the amount of the civil fines that the Board was seeking to collect. The scope of this injunction was further refined when it was issued in writing on December 23, 1993. In our view, the district court's prompt action and narrow tailoring of its orders))which were based on a thorough consideration of the evidence presented))eviscerate the arguments asserted by DLG and De La Garza in support of their due process claim.

### 3. The Board's Prima Facie Case

Finally, DLG and De La Garza insist that the Board did not present sufficient evidence to establish a prima facie case, as required to justify the November 1 Order and the subsequent preliminary injunctions. We find, however, that the facts are otherwise.

DLG and De La Garza first argue that DLG was not a bank holding company because DLG neither owned nor had the ability to control or vote the stock of the International Bank, N.A. This assertion, however, is refuted by the express terms of the security agreement containing the pledge of the bank stock as collateral for the promissory notes. The agreement provided that, if the notes came into default, the secured noteholder could exercise all voting rights of the pledged stock. As DLG obtained the notes when they were already in a condition of default, DLG immediately acquired the power to vote all of the stock in the International Bank, N.A., ipso facto becoming a bank holding company pursuant to the BHCA.[43]

---

[43]A company becomes a bank holding company if, inter alia, it has the power to vote 25% or more of any class of voting security of a bank. 12 U.S.C. § 1841(a)(2)(A).

21

Nevertheless, DLG and De La Garza contend that, even if DLG were a bank holding company, it was not required to obtain Board approval prior to the acquisition because DLG previously contracted for control of the bank in good faith, an exception to the notice requirement.  This argument also lacks merit.

At the outset, we note the explicit admonishment from Congress that "[t]he Board should interpret . . . exemptions [from the BHCA] as narrowly as possible in order that all bank holding companies which should be covered under the Act in order to protect the public interest will, in fact, be covered."[44]  Section 1841(a)(5)(D) exempts prior Board approval if a company becomes a bank holding company "by virtue of [its] ownership or control of shares acquired in securing or collecting a debt <u>previously</u> contracted in good faith."[45]  But here, when DLG and De La Garza purchased the promissory notes they were already in default.  So DLG and De La Garza obtained <u>immediate</u> power to vote the shares of a bank; thus the debt they acquired was not one that they had "<u>previously</u> contracted in good faith."

Our reading of § 1841(a)(5)(D) is consistent with interpretations by the FDIC and the Office of the Comptroller of the Currency ("OCC") of an analogous provision.  Section 1817(j) of

---

[44]BANK HOLDING COMPANY ACT AMENDMENTS OF 1970, H.R. CONF. REP. NO. 1747, 91st Cong., 2d Sess. 23 (1970), <u>reprinted in</u> 1970 U.S.C.C.A.N. 5561, 5574.

[45]<u>Id.</u> § 1841(a)(5)(D) (emphasis added); 12 C.F.R. § 225.12(b).

the Change in Bank Control Act of 1978 ("CBCA"),[46] provides that no person may acquire control of any insured bank unless the appropriate federal banking agency has been given prior written notice of the proposed transaction.[47] Prior notice is not required, however, if the shares are acquired "in satisfaction of a debt previously contracted in good faith."[48]

Both the FDIC and the OCC have expressly stated that this exemption to the notice requirement is not applicable where a loan collateralized by a controlling interest of the stock of an insured bank is purchased and the loan already is in default.[49] In such an instance, the FDIC recognized that "the acquisition of the loan and the acquisition of the shares is virtually inseparable due to the default status of the loan at the time of its purchase."[50] Thus, "[i]n order for the `good faith' element of the [debt previously contracted in good faith] exemption to be satisfied, a lender must either make or acquire a loan secured by bank stock in advance of any known default."[51] As we find neither arbitrary nor capricious

---

[46]Pub. L. No. 95-630, 92 Stat. 3683 (codified as amended in scattered sections of 12 U.S.C.).

[47]Id. § 1817(j). As with the BHCA, "control" of an insured depository institution means, inter alia the power, directly or indirectly, to vote 25% or more of any class of voting securities.

[48]See 12 C.F.R. § 5.50(f)(3).

[49]See FDIC Interp. Ltr. Rul. 84-13 (Aug. 3, 1984); OCC Inter. Ltr. No. 451, Fed. Banking L. Rep. (CCH) ¶ 85,675 (Aug. 8, 1988).

[50]FDIC Interp. Ltr. Rul. 84-13, at 2.

[51]OCC Inter. Ltr. No. 451.

23

this consistent interpretation, and we see no meaningful distinction between the good faith exemptions of the CBCA and the BHCA, we conclude that the good faith exemption was inapplicable here, making prior Board approval a requirement. And, as DLG and De La Garza failed to obtain the requisite approval, the Board did establish a prima facie case that the parties were liable for civil money penalties under the BHCA.[52]

III

CONCLUSION

For the foregoing reasons, we conclude that the Dallas Court properly dismissed claims by DLG and De La Garza for declaratory and injunctive relief and monetary damages. We therefore affirm the judgment of that district court.

We also conclude that the November 1 Order issued by the Houston Court was not appealable. We therefore dismiss the appeal of that Order.

And finally we conclude that the then-current version of § 1811(i)(4) of the BHCA did not violate due process, and that the

---

[52]Nevertheless, we are troubled by the actions taken by closely related government entities that resulted in these lawsuits. Here, the FDIC sold the controlling vote in a bank (by virtue of selling an already delinquent promissory note that was secured by a pledge of bank stock already susceptible of being voted by the pledgee), immediately after which the FRBD interceded, alleging that the purchaser was a "bad guy" for violating the BHCA requirement for prior approval and))coincidentally, or perhaps not so coincidentally))claiming a fine exactly equal to the profit made by the purchaser when he divested himself of the note (and bank control), as demanded by the FRBD. This kind of "Mutt and Jeff" activity by apparently over-zealous regulators hardly makes one proud of his government, even if such activity is technically lawful.

24

Houston Court was correct in holding that the Board established a prima facie case that civil money penalties against De La Garza and DLG were appropriate.  Accordingly, all rulings in that case are, in all respects, affirmed.

94-10078 is AFFIRMED; 93-2944 is DISMISSED; 94-20013 is AFFIRMED.