**TEMPO MUSIC, INC., Robbins Music Corporation, Remick Music Corporation, and Mills Music, Inc., Appellees,**

v.

**James D. MYERS, Appellant.**

**No. 12679.**

United States Court of Appeals Fourth Circuit.

Argued Dec. 2, 1968.

Decided Feb. 27, 1969.

Robert M. Bryant, Winston-Salem, N. C., for appellant.

W. P. Sandridge, Jr., Winston-Salem, N. C., and Herman Finkelstein, New York City (Carl L. Zanger, New York City, and I. T. Cohen, Atlanta, Ga., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and BOREMAN and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Because the Showmen Four "Combo" played four popular songs for the enjoyment of patrons of the Gold Leaf Supper Club, Proprietor James D. Myers found

himself mulcted in damages, $250 for the performance of each song, plus an award of $1,000 as counsel fees. To prevent what seems to us manifest injustice, we reverse and remand with instructions to dismiss the complaint.

Although "[c]ases involving popular songs are often baffling, particularly where the proof of copying rests on circumstantial evidence consisting primarily of similarities between the songs," 18 Am.Jur.2d Copyright and Literary Property § 111 (1965), we think the district judge rightly decided that there had been infringement. Certainly the performance was done "publicly for profit." 17 U.S.C. § 1(e). That the several plaintiffs held valid copyrights on "Satin Doll," "Shangri-La," "Bye-Bye Blackbird" and "I Can't Give You Anything But Love" is undisputed. There was substantial evidence that these selections, and not other similar ones as contended by defendant, were actually performed by the combo. Nor was it disputed that Myers had purchased no license for the performance of these musical compositions although he had been solicited to accept a license and to pay for it by the American Society of Composers, Authors, and Publishers as legal representative of plaintiffs. The district judge's ultimate finding of infringement is thus fully supported by the evidence and is not clearly erroneous.[1]

We might quickly dispose of the case but for an omission in the court below caused, we think, by too rigid an application of a routine pretrial order. As sometimes happens, what was left out of the pretrial order turns out to be more important than what was put in it. Pretrial orders may be useful tools, but if followed too slavishly, they may actually hamper the proper administration of justice, and we think that occurred here.[2] Misled by the recital of counsel in the pretrial order that the only "issues of fact" were whether the defendant infringed the four musical compositions by giving a public performance for the entertainment of persons attending the Gold Leaf Supper Club, the district judge almost dealt with, but passed over, what seems to us a controlling question of law arising on virtually undisputed facts.[3]

According to uncontradicted testimony, Myers was solicited by an agent for ASCAP to take a license sometime during the year 1965. Myers testified as follows:

Myers: "At that time, I asked him to give me a list of the ASCAP tunes that was covered under the license, and I would not play any ASCAP tunes * * *."

* * * * * *

"QUESTION: Did the ASCAP agent give you a list of any music compositions or composers or companies—music companies—that their license would presumably cover?

"ANSWER: No, sir.

1. Pastime Amusement Co. v. M. Witmark & Sons, 2 F.2d 1020 (4th Cir. 1924); Bourne v. Fouche, 238 F.Supp. 745 (E. D.S.C.1965); Lerner v. Club Wander In, Inc., 174 F.Supp. 731 (D.Mass.1959). Cf. Arnstein v. Porter, 154 F.2d 464 (2d Cir. 1946); Arnstein v. Broadcast Music, 137 F.2d 410 (2d Cir. 1943).

2. In response to an inquiry from this court, counsel for the plaintiffs have furnished to the Clerk a statement reading, in part, as follows:
"The parties are asked to supply the Court with a statement as to when the Defendant first asked for a list of ASCAP tunes. It was not until the trial that the Defendant raised the point that such a list had been requested. *The pre-trial order had narrowed the issues to the question of whether or not the four tunes had been played.*" (Emphasis ours).

3. At the close of the evidence counsel for Myers argued to the court: "I think it's incumbent upon the Plaintiff,—the real Plaintiff is ASCAP,—to show the Court that they made some good faith effort to indicate to the Defendant, when he indicated he didn't want to purchase their license, what it was that he was not permitted to play,—or any of his employees on the premises, and they did not * * *." (Tr. p. 54).
Although the district judge expressed interest and concern, the colloquy passed on to other matters.

"QUESTION: Were you at any time furnished a list of musical compositions which ASCAP claimed to have exclusive right to license?

"ANSWER: No, sir,—he came back and talked with me again, and again, I asked him for a list, and he said—he said they had so many, it was almost impossible."

■ Though such a listing was unquestionably requested we do not fault ASCAP [4] as agent of the defendants for its failure to supply it. Counsel advised us that the total listing of ASCAP songs fills three large volumes and, if furnished Myers, would not likely have been useful to him for the desired purpose. But without some help from ASCAP, Myers' position was impossible. Despite his expressed intention to avoid infringement, he could not possibly hope to do so except by the alternatives of (a) playing no music at his club or (b) paying what he regarded—rightly or wrongly—as an exorbitant licensing fee.

Pretrial order or not, we think the court below was presented by the testimony of Myers with a question of controlling importance: whether ASCAP had any duty to respond to Myers' request for a list of copyrighted compositions, and if so, what sort of response was required. We think the answer to this question is found in the Amended Consent Judgment [5] of March 14, 1950, under which, we are advised by counsel, ASCAP now operates. Part of that antitrust consent judgment provides as follows:

"XIV. Immediately following entry of this Judgment, defendant ASCAP shall upon written request from any prospective user inform such user whether any compositions specified in such request are in the ASCAP repertory, and make available for public inspection such information as to the ASCAP repertory as it has. Defendant ASCAP is furthermore ordered and directed to prepare within two years, and to maintain and keep current and make available for inspection during regular office hours, a list of all musical compositions in the ASCAP repertory, which list will show the title, date of copyright and the author, composer and current publisher of each composition."

In oral argument, counsel for ASCAP urges what seems to be a reasonable solution to Myers' problem: that he should simply have sent a list of the Showmen Four's tunes to ASCAP, which would gladly compare the list with its own listing and promptly advise Myers which tunes could not be played without infringement. Significantly, ASCAP does not maintain, nor could it, that Myers *knew* this, for there is nothing in the record to support such conjecture, and Myers' testimony suggests the contrary. Without some knowledge that this service, now so cheerfully offered, was available, Myers could scarcely have availed himself of it. [6]

4. Although ASCAP is not a party its counsel participated in the trial below and the hearing on appeal. The selection of the actual plaintiffs results from the pure accident of what the combo happened to play on the night of February 3, 1967, at the Gold Leaf Supper Club. Presumably on another night there would be different tunes offered the patrons, and a different set of plaintiffs would be selected thereby from the approximately 12,000 members of ASCAP.

ASCAP's conduct is, of course, to be imputed to its principals. *See* K-91, Inc. v. Gershwin Publishing Corp., 372 F.2d 1 (9th Cir. 1967), cert. denied 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968).

5. Civil Action No. 13–95, entered in the Southern District of New York, March 14, 1950, in a case entitled United States of America, plaintiff v. American Society of Composers, Authors and Publishers, et al., defendants.

6. Equally ineffective as an explanation of how infringement might be avoided is the explanation of counsel for ASCAP in the court below. At pages 55 and 56 of the transcript of trial, ASCAP's counsel explained that lists of music companies whose tunes were licensed through ASCAP were sent *to proprietors*, and that one was sent to Myers. Also, ASCAP's representative "went around and explained" *to bandleaders* that copyright

We hold that ASCAP was under a duty to advise of its editing obligation under paragraph XIV of the antitrust consent judgment, and to advise that such service was available upon request, when a communication was made to ASCAP by Myers which could have been fairly interpreted as a request for aid in avoiding infringement.[7] As ASCAP failed to comply with Myers' request for a listing of ASCAP compositions, and also failed to offer the editing service contemplated by the consent decree, we think it would be inequitable to permit these plaintiffs to recover for the infringement which occurred and which was caused and brought about, in part at least, by the dereliction of ASCAP in failing to facilitate Myers' expressed intention of avoiding infringement. Under such circumstances, we think these plaintiffs are estopped[8] to assert infringement and ask for damages and counsel fees. To allow it would enable them to profit from the dereliction of their own agent, ASCAP. So to hold is merely an application of the ancient equitable doctrine of "unclean hands." Humble Oil & Refining Co. v. Standard Oil of Kentucky, 229 F.Supp. 586, rev'd on other grounds, 363 F.2d 945 (5th Cir. 1966) cert. denied 385 U.S. 1007, 87 S.Ct. 714, 17 L.Ed.2d 545 (1967). See also Folmer Graflex Corp. v. Graphic Photo

law required that sheet music show the name of the company holding the copyright. Therefore, even if a band played by ear, it could go to a music store and find on the sheet music of tunes in their repertoire the names of the companies holding the copyright, compare those companies with the list of companies sent to the proprietor for whom they were playing, and edit their own list to avoid infringement.

The problem with this method ASCAP employed to enable infringement to be avoided is that all of the critical information is not put into the same hands, and only a seemingly irrelevant part of it— a list of music companies—is put into the hands of the proprietor, who is often, as here, the party really threatened by an infringement suit. As a bandleader such as the leader of the Showmen Four is infrequently the defendant in an infringement suit, his incentive to check his own music, absent a request from the proprietor, is minimal. The proprietor will hardly make the request unless he knows how the checking may be done, and he does *not* know, because that part of the information was given to the bandleader.

Consequently, this dissemination of information by ASCAP does not realistically apprise the proprietor of any method of avoiding infringement.

7. Antitrust decrees must be read in the light of their intended objectives, and a balance must be struck between the interests of the public and those of the defendants. *Cf.* United States v. Swift & Co., 189 F.Supp. 885 (N.D.Ill.1960) aff'd 367 U.S. 909, 81 S.Ct. 1918, 6 L.Ed.2d 1249 (1961). Considering the relative sophistication of the parties with respect to copyright and antitrust, we think it not unfair to ASCAP and these plaintiffs to require ASCAP to disclose to one seeking to avoid infringement its obligation under the consent decree to check any list submitted. Reasonable opportunity to offer the service required by the consent decree was not lacking. In addition to personal contacts, ASCAP wrote Myers nine times.

To hold that ASCAP was under such a duty is entirely consonant with the concept of copyright notice. The notice of copyright in a musical work must appear either upon its title page or the first page of music. 18 Am.Jur.2d Copyright and Literary Property § 58 (1965). The purpose of the copyright notice is to prevent innocent persons, in ignorance of the existence of the copyright, from using a copyrighted article. *Id.* § 57.

8. The complaint here sought both injunctive relief and damages at law. A suit for copyright infringement, insofar as it seeks an injunction, is equitable in nature. To the extent to which a copyright infringement suit is equitable, it is well established that the doctrine of unclean hands will be invoked to bar recovery. *E.g.*, Wihtol v. Crow, 199 F.Supp. 682 (D.Iowa 1961), rev'd on other grounds 309 F.2d 777 (8th Cir. 1962); Gaye v. Gillis, 167 F.Supp. 416 (D.Mass.1958). Where only damages are sought, an infringement suit is brought at law. However, equitable estoppel applies both in law and in equity to deny a party the right to plead or prove an otherwise important fact—here, the act of infringement—because of something he has done or omitted to do. 18 Am.Jur.2d Copyright and Literary Property, §§ 26, 27 (1965).

Service, 41 F.Supp. 319 (D.Mass.1941). *Compare* Leo Feist, Inc. v. Young, 138 F.2d 972 (7th Cir. 1943), rev'g 46 F. Supp. 622 (D.C.1942).

On remand the district court will enter judgment for the defendant.

*Reversed.*