ABC, INC., Plaintiff,

v.

**PRIMETIME 24, JOINT VENTURE,**
**Defendant.**

No. Civ.A. 1:97CV00090.

United States District Court,
M.D. North Carolina.

Aug. 19, 1998.

Reid L. Phillips, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, Wade Hampton Hargrove, Brooks Pierce McLendon Humphrey & Leonard, L.L.P., Raleigh, NC, for Plaintiff.

W. Andrew Copenhaver, Womble Carlyle Sandridge & Rice, Winston–Salem, NC, Pressly McAuley Millen, Womble Carlyle Sandridge & Rice, Raleigh, NC, Andrew Z. Schwartz, Stephen B. Deutsch, Richard M. Brunell, Daniel H. Haines, Foley Hoag & Eliot, LLP, Boston, MA, for Defendant.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

This case is currently before the court on the motion by Plaintiff ABC, Inc. ("ABC") for summary judgment. In a memorandum opinion issued July 16, 1998, this court found that no reasonable fact finder could fail to find that Defendant PrimeTime 24 ("PrimeTime") is infringing upon ABC's copyright in its network programming by exceeding the scope of its compulsory license under the Satellite Home Viewer Act ("SHVA"), 17 U.S.C. § 119, that PrimeTime has engaged in a pattern or practice of willful or repeated copyright infringement by exceeding the scope of this license, and that PrimeTime has violated the Act's reporting requirements. The court's present task is to determine

whether any factual issue exists regarding PrimeTime's affirmative defenses and, if not, whether PrimeTime's equitable defenses affect the injunctive relief sought by ABC. For the reasons stated in the court's earlier memorandum opinion and for the reasons that follow, the court finds that PrimeTime's defenses are insufficient as a matter of law and that ABC is entitled to summary judgment and a permanent injunction prohibiting PrimeTime from broadcasting ABC network programming within WTVD's local market.

## BACKGROUND

The factual background of this case is described with greater detail in this court's memorandum opinion of July 16, 1998, and will only be summarized here. In 1988, Congress passed the Satellite Home Viewer Act ("SHVA"), 17 U.S.C. § 119, providing satellite carriers with a limited compulsory license to broadcast network programming for private home viewing to households located in so-called "white areas," *i.e.*, households that cannot receive an over-the-air signal of a certain minimum strength and that have not recently subscribed to a cable television system. The purpose of the Act was to provide network programming to those primarily rural areas that were not served by a local network affiliate, while maintaining the existing national network/local affiliate television program distribution system by protecting the local affiliate's right to broadcast network programming within its local market. *See* H.R.Rep. No. 100–887(I), at 8 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5577, 5611. The Act maintains the local affiliate's rights in network broadcasting by limiting the compulsory license to those households that "cannot receive, through the use of a conventional outdoor rooftop receiving antenna, an over-the-air signal of grade B intensity (as defined by the Federal Communications Commission) of a primary network station affiliated with that network," 17 U.S.C. § 119(d)(10)(A), and have not recently received cable service.

ABC has purchased on the open market the copyrights to its network programming. ABC also owns and operates the television station WTVD in Durham, North Carolina. WTVD is a primary network station of The ABC Television Network and is licensed to televise the programming of that network within its local market.

PrimeTime is a satellite carrier engaged in the business of uplinking by satellite the programming of various broadcast networks' television stations and reselling the programming of these stations to satellite dish owners. PrimeTime has not obtained licenses to do so in the open market. Rather, it relies on the compulsory license provided by SHVA. Despite SHVA's unambiguous reference to signal strength as the first criteria of eligibility, PrimeTime's screening procedures have systematically substituted a subjective inquiry into the quality of the picture on a potential subscriber's television set for any signal strength testing. PrimeTime has ignored or turned a blind eye to the necessity of objective signal strength testing and thus willfully or repeatedly provides network programming to subscribers that are ineligible under SHVA.

In the memorandum opinion of July 16, 1998, the court found that there was no real dispute that PrimeTime had not only committed individual violations by serving ineligible households, but had engaged in a pattern or practice of such violations. PrimeTime has provided network services to approximately 35,000 households within WTVD's local market. The latest data provided by PrimeTime reflects over 9,000 subscribers within WTVD's predicted Grade B contour. Of these it has tested only fourteen subscriber households. These tests revealed that only five households could receive, through the use of a conventional outdoor rooftop receiving antenna, an over-the-air signal of Grade B intensity.[1] PrimeTime's violation of SHVA is on-going. It continues to enroll new subscribers and provide service without signal strength testing.

1. PrimeTime has protested that these tests revealed more than five households could not receive a Grade B signal at the television set. Testing of the signal at a subscriber's television set is irrelevant to whether or not that household

can receive an over-the-air signal of Grade B intensity because the Grade B measure as defined by the FCC is a measure of ambient field strength. *See* 47 C.F.R. § 73.683(a).

The issue now before the court is twofold: whether or not PrimeTime has raised a factual issue on its affirmative defenses designed to defeat injunctive relief, and, if not, whether these defenses are sufficient to limit the scope of equitable relief. For PrimeTime's individual violations of SHVA's white area restriction and reporting violations, ABC seeks an injunction enforcing compliance with the Act. For PrimeTime's pattern or practice of willful or repeated violations of the white area restriction, ABC seeks an injunction prohibiting PrimeTime from providing ABC network programming via satellite to any subscriber within WTVD's local market. ABC also seeks costs and attorney's fees.

PrimeTime claims that WTVD and its employees have interpreted SHVA's white area restriction to be satisfied by a subjective picture quality test and thus ABC's requested relief is barred by estoppel, unclean hands, or waiver. PrimeTime argues that the facts supporting these affirmative defenses, consisting of the admissions and conduct of WTVD and ABC officials, are undisputed. PrimeTime claims that even if these affirmative defenses do not bar all injunctive relief as a matter of law, the same arguments serve as equitable defenses limiting the scope of ABC's relief. The evidence supporting estoppel, unclean hands, and waiver, in the light most favorable to PrimeTime, consists of the following:

- The networks refused to reach an agreement with PrimeTime regarding a permanent licensing scheme or the industry standards for determining household eligibility under SHVA.
- PrimeTime repeatedly wrote to WTVD, encouraging comment or criticism regarding their SHVA compliance procedures and requesting a map of WTVD's grade B contour and a list of the zip codes within this service area. WTVD never responded.
- Counsel for ABC, in explaining to network stations SHVA's legal standard for eligibility, equated "Grade B signal" with picture quality. (Levi Decl.Ex. E).
- WTVD's business manager William Higgs and the station general managers with whom he worked were aware of twenty to thirty friends or acquaintances who subscribed to satellite carriers for network services even though they supposedly could get adequate over-the-air signals. WTVD did not, however, challenge these subscribers.
- An employee of WTVD, whose responsibility it was to help determine which PrimeTime subscribers WTVD should challenge, subscribed to PrimeTime even though she lived within forty-five miles of WTVD's transmitter (well within WTVD's predicted Grade B contour) and never had WTVD's signal strength tested at her household.
- WTVD challenged the eligibility of PrimeTime's subscribers only once, in December 1994, pursuant to a voluntary transitional signal intensity measurement scheme. After making this challenge, WTVD received complaints and requests for waivers from the challenged subscribers.
- In deciding whether to grant waivers to these challenged subscribers, WTVD first sent a questionnaire asking about "any difficulty you have in receiving our station's signal." (Higgs Dep. at 76–77 & Ex. 77).
- WTVD employees would then visit the homes of PrimeTime's subscribers and evaluate the picture quality in assessing whether or not WTVD should grant the subscriber a waiver. If the picture had defects such as "ghosting" or a "noisy signal" WTVD's chief engineer Curt Meredith would recommend a waiver. (Meredith Dep. at 73–74). Furthermore, the meter in the WTVD truck sent to a complaining subscriber's house was not even calibrated, so that the operators considered any reading "meaningless." (Glasco Dep. at 18–19).
- WTVD withdrew its challenge to approximately 100 subscribers after they complained to WTVD about the termination of their satellite network service. The letters sent by WTVD to PrimeTime simply listed the complaining subscriber by name and address and stated that "[a]fter review of the circumstances, WTVD has decided to

withdraw our challenge." (Higgs Dep. Ex. 97).

● ABC's vice president with responsibility for SHVA reporting issues, Michael Nissenblatt, has acknowledged that PrimeTime's subscriber reporting is "going pretty smoothly" and that any delays are due to "both sides." (Nissenblatt Dep. at 160).

● This case is one of three lawsuits brought against PrimeTime, collectively financed by the four major national networks (NBC, ABC, CBS, and Fox), the affiliate associations of each major network, and the National Association of Broadcasters.[2]

PrimeTime bears the burden of proof on each of its affirmative defenses. In order to defeat summary judgment on these defenses, PrimeTime must point to admissible evidence in the record to support the elements of each defense. *See* Fed.R.Civ.P. 56(e). Because, as PrimeTime admits, there is no genuine dispute as to material facts regarding PrimeTime's affirmative defenses, the court may decide these issues as a matter of law.

## DISCUSSION

### I. *PrimeTime's Affirmative Defenses*

In the memorandum opinion issued July 16, 1998, this court found that there was no genuine dispute that PrimeTime had not only committed individual copyright violations, but had also engaged in a pattern or practice of willful or repeated copyright violations within WTVD's local market and had violated SHVA's reporting requirements. Furthermore, PrimeTime's violations are on-going. ABC has sought injunctive relief designed to prohibit PrimeTime from the transmission of ABC programming within this market or, in the alternative, to require PrimeTime's compliance with SHVA. PrimeTime has asserted three affirmative defenses against the issuance of injunctive relief: estoppel, unclean hands, and waiver. Because PrimeTime has failed to raise a genuine issue with respect to the affirmative defenses it attempts to raise,

ABC is entitled to judgment as a matter of law.

### A. *Estoppel*

█ PrimeTime first argues that ABC is estopped from asserting either that SHVA requires a signal-strength test at every household or that PrimeTime's violations were willful or repeated. In order to invoke equitable estoppel to defeat an otherwise valid claim of copyright infringement, a defendant must show that the plaintiff (1) misrepresented or concealed material facts, (2) with the intent or expectation that the defendant would act upon those misrepresentations or concealments, (3) that the plaintiff had actual or constructive knowledge of the true facts, and (4) the defendant reasonably and detrimentally relied upon the plaintiff's misrepresentations or concealments. *Service & Training, Inc. v. Data General Corp.,* 963 F.2d 680, 689–90 (4th Cir.1992). The textbook example of estoppel occurs when the copyright owner is aware of the defendant's infringing conduct yet acts in a manner that induces the infringer reasonably to rely upon such action to his detriment. *See Bourne Co. v. Hunter Country Club, Inc.,* 990 F.2d 934, 937 (7th Cir.), *cert. denied,* 510 U.S. 916, 114 S.Ct. 308, 126 L.Ed.2d 256 (1993).

█ PrimeTime argues that prior to this suit ABC and WTVD interpreted eligibility under SHVA to turn on whether or not a viewer could receive an acceptable picture. PrimeTime has no evidence, however, that ABC or WTVD ever indicated to PrimeTime that they would consider picture quality as the test for subscriber eligibility. WTVD's silence in the face of PrimeTime's letters outlining their compliance procedures under SHVA could not induce reasonable reliance, given the on-going dialogue between ABC and PrimeTime concerning their dispute over the scope of SHVA's compulsory license. Because PrimeTime lacks evidence from which a reasonable fact finder could find reasonable detrimental reliance, PrimeTime's estoppel argument fails as a matter of law.

---

**2.** Although PrimeTime has filed a pending antitrust suit against the networks in the Southern District of New York, *PrimeTime 24 Joint Venture v. National Broadcasting, Co., Inc.,* 97 Civ. 3951(LMM), —— F.Supp.2d ——, 1998 WL 671578 (S.D.N.Y. Sept. 28, 1998), no counterclaims are before this court.

### B. Unclean Hands

■ PrimeTime next argues that ABC is not entitled to equitable relief because they or their agents have unclean hands. It is a well recognized canon of equity jurisprudence that "[a]ny party seeking equitable relief must come to the court with 'clean hands.'" *Atari Games Corp. v. Nintendo of America, Inc.*, 975 F.2d 832, 846 (Fed.Cir. 1992) (citing *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933)). The doctrine of unclean hands will bar a plaintiff's equitable remedy for a copyright violation where the plaintiff is guilty of misconduct rising to the level of fraud, deceit, unconscionability or bad faith, *see Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373 (6th Cir.1995), or where the copyright infringement was caused in part by the plaintiff, *see Tempo Music. Inc. v. Myers*, 407 F.2d 503, 507 (4th Cir.1969).

■ PrimeTime has no evidence that ABC or its agents have acted fraudulently, deceitfully, or in bad faith. Although the satellite industry and the broadcast industry are engaged in a bitter dispute about the nature and purpose of SHVA's compulsory license, this appears to be the sort of bona fide dispute that does not by itself create a defense of unclean hands. *See Performance Unlimited*, 52 F.3d at 1383–84. Furthermore, WTVD did not contribute to PrimeTime's infringing conduct. PrimeTime's reliance upon *Tempo Music* is misplaced. The plaintiff therein was obligated by a consent decree to provide the defendant, upon inquiry, with information exclusively within its control and necessary for the defendant to avoid copyright infringement. *Id.* 407 F.2d at 507. WTVD was under no similar duty to respond to PrimeTime's solicitation of comments on its compliance program or its requests for a map of WTVD's predicted service contour and a list of zip codes within these contours. PrimeTime knew that ABC rejected a picture quality test for SHVA eligibility. Furthermore, the information PrimeTime requested from WTVD was publicly available.[3] PrimeTime's unclean hands defense therefore fails as a matter of law.

### C. Waiver

■ PrimeTime finally argues that ABC and its agents waived SHVA's restriction of eligible households to those receiving a Grade B signal. Waiver is the intentional and voluntary relinquishment of a known right or privilege. *See U.S. v. King Features Entertainment, Inc.*, 843 F.2d 394, 399 (9th Cir.1988). It may be established either through an express statement or by implication through a party's conduct inconsistent with an intent to assert a right. Waiver and estoppel are related but distinct concepts. The intent to relinquish a right is a necessary element of the former but not the latter; detrimental reliance is a necessary element of the latter but not the former.

■ Whether a right is waivable and whether certain procedures are required for waiver depend on the nature of the right at stake. For example, a statutory right may not be waived or released if such waiver or release contravenes the purpose of the statute. *See Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 737, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (employee's rights under Fair Labor Standards Act held not waivable by collective bargaining agreement), and *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 51, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (employee's rights to nondiscrimination under Title VII held not waivable by collective bargaining).

ABC argues that SHVA's white area restriction is the type of public interest statutory requirement that may not be waived. The

---

**3.** In addition, the geographic information allegedly sought by PrimeTime was not determinative of whether or not its subscribers were eligible. *See* H.R.Rep. No. 103–703, at 14 n. 6 (1994) ("The term 'predicted Grade B contour' as used in this Act refers to the area referred to currently in Rule 73.684 of the Rules of Federal Communications Commission, as the area predicted to receive a signal from a network station of at least Grade B intensity. By contrast, the definition of an 'unserved household' in Section 119(d)(10) refers to the use of a conventional outdoor rooftop receiving antenna to receive 'an over-the-air signal of Grade B intensity' as defined by the FCC, *thereby requiring that the household actually receive a signal of that intensity*.") (emphasis added).

court is not inclined to agree. Congress specifically contemplated that satellite carriers could obtain licenses other than SHVA's compulsory license. *See* H.R.Rep. No. 100–887(I), at 27 (1988) ("Unless the statutory license of section 119 is obtained ... the secondary transmission by a satellite barrier for private home viewing can take place only with the consent of the copyright owner."); H.R.Rep. No. 100–887(II), at 15 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5638, 5644 ("It is the Committee's expectation that during the pendency of this legislation the home satellite antenna marketplace will grow and develop so that marketplace forces will satisfy the programming needs and demands of home satellite antenna owners in the years to come, eliminating any further need for government intervention."). Nothing in the text of SHVA or its legislative history indicates that a network or local affiliate could not agree with a satellite carrier to base subscriber eligibility on criteria other than SHVA's objective signal strength test.

■ Neither ABC nor WTVD expressly granted a market-wide waiver of the right to enforce SHVA's white area restriction within WTVD's local market. Express waivers are oral or written statements whereby a party intentionally and voluntarily relinquishes a known right or privilege. The only evidence of any express waiver produced by Prime-Time consists of letters whereby WTVD withdrew its challenges to approximately 100 subscribers. Even if these letters constitute express waivers, whereby ABC and WTVD waived the right to contest the eligibility of these individual households, PrimeTime still has over 9,000 subscribers within WTVD's predicted Grade B contour that were enrolled without benefit of any signal strength

test. Removing the 100 subscribers with "waivers" from the equation does not alter the fact that (1) PrimeTime has failed to carry its burden of proving eligibility for all but five of its subscribers within WTVD's local market, and that (2) PrimeTime's substitution of the subjective picture quality test for SHVA's objective signal strength test has led to systematic violation of SHVA's white area restriction. Therefore, the individual "waivers" granted by WTVD cannot defeat PrimeTime's liability for a pattern or practice of willful or repeated violations, within WTVD's local market, of SHVA's eligibility restrictions.

■ PrimeTime also argues that WTVD, through the indifference of its personnel, waived the right to insist on enforcement of SHVA's objective signal strength test for eligibility. When there is no express waiver, an implied waiver may be found in clear, decisive, and unequivocal conduct indicating an intent to waive the legal right involved. Implied waivers are generally not favored in the law. *See, e.g.,* 21 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure*, Evidence § 5033 (1977) (arguing that the concept of an "implied waiver" is a fiction, because waiver requires the intentional relinquishment of a known right and one cannot reliably infer such knowing relinquishment from a mere failure to act).

■ The conduct PrimeTime attributes to WTVD personnel is insufficient as a matter of law to constitute an implied waiver. Waiver does not occur merely if a plaintiff is aware of the defendant's infringement but fails to act. Rather, a plaintiff must have actually undertaken acts inconsistent with its copyright.[4] The only evidence PrimeTime

---

4. PrimeTime makes much of the fact that WTVD did not challenge PrimeTime's subscribers, eligibility more than once, in December 1994. PrimeTime's argument ignores the fact that its failure to provide complete and timely subscriber information, in violation of Section 119(a)(3), undermined WTVD's ability to challenge the subscribers it thought were potentially ineligible. Furthermore, it is clear that WTVD was reluctant to challenge PrimeTime's subscribers not because it acquiesced in PrimeTime's conduct, but because WTVD's only previous challenge failed to yield positive results. In December 1994, WTVD challenged the eligibility of over 700

PrimeTime subscribers within WTVD's local market, pursuant to Section 119(a)(8). After WTVD made its challenge, PrimeTime withheld action upon it until the end of April 1995. Blaming the broadcast networks and their affiliates for the delay, PrimeTime terminated its challenged subscribers only in stages: some in April 1995, some in August 1995, and a few in August 1996. The notices of termination PrimeTime sent to these subscribers placed the blame for their loss of service squarely with WTVD. As a result, WTVD was inundated with calls and letters from irate subscribers, some of which threatened action against the station. The successful chal-

has produced in this regard is the testimony that WTVD employees decided whether WTVD should withdraw some challenges to individual subscribers based upon the quality of the picture on the subscriber's television set, rather than by conducting a signal strength test. Even if WTVD has waived the right to contest service to the 100 households for which it withdrew its challenge, this evidence is insufficient as a matter of law to carry PrimeTime's burden of establishing a market-wide waiver of the right to insist on a signal strength test for subscriber eligibility. The methodology by which WTVD engineers decided to withdraw certain challenges simply does not translate into an intentional decision by WTVD to forever abandon SHVA's signal strength test in favor of PrimeTime's subjective picture quality test with respect to every subscriber in the local market. Cf. *Microstar v. Formgen, Inc.*, 942 F.Supp. 1312, 1318 (S.D.Cal.1996) (holding that the plaintiff's allowance of customers to create derivative works for non-commercial purposes did not impliedly license commercial competition).

### D. *Reporting Violations*

PrimeTime argues that ABC is not entitled to relief on its claim for reporting violations under Section 119(a)(3) because ABC's vice president in charge of SHVA reporting acknowledged that delays in reporting were due to both sides and that the process is now going fairly smoothly. As this court found in its earlier memorandum opinion, PrimeTime has violated Section 119(a)(3) by failing to provide ABC with the required customer information on the schedule required by SHVA. Although the arguments raised by PrimeTime could affect the scope of equitable relief for these violations, they are insufficient to defeat ABC's claim.

PrimeTime has therefore failed to raise a factual issue with respect to its arguments for estoppel, unclean hands, and waiver, and its affirmative defenses fail as a matter of law.[5] For these reasons and for the reasons stated in the court's earlier memorandum opinion, ABC is entitled to judgment as a matter of law on its claims of copyright infringement for PrimeTime's willful or repeated individual violations of SHVA, for PrimeTime's pattern or practice of willful or repeated violations within WTVD's local market, and for PrimeTime's violation of SHVA's reporting requirements.

### II. *Remedy for PrimeTime's Pattern or Practice of Copyright Violation*

Because ABC is entitled to judgment as a matter of law on its claims of

---

lenges made by WTVD thus undermined the station's goodwill.

It is also abundantly clear that throughout the period PrimeTime operated in WTVD's local market, ABC and its representatives vigorously continued to insist upon PrimeTime's use of SHVA's objection signal strength test for subscriber eligibility. Even in the light most favorable to Defendant, PrimeTime was receiving mixed signals about their ability to broadcast ABC network programming to its subscribers in WTVD's local market. Sending mixed signals falls far short of the clear, decisive, and unequivocal conduct necessary to demonstrate an implied waiver.

5. Although PrimeTime did not raise the argument in its opposition to ABC's summary judgment motion, PrimeTime asserted for the first time in its trial brief that the doctrine of laches also barred ABC from obtaining relief. This argument is without merit. The doctrine of laches is to be sparingly applied where, as here, the plaintiff seeks only equitable relief. See *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 461 (4th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 412, 136 L.Ed.2d 325 (1996). PrimeTime began selling network programming via satellite to households within WTVD's local market in 1989. Due to conflicts between the networks and the satellite carriers over the eligibility of the latter's subscribers, Congress amended SHVA in 1994 to provide for a voluntary transitional signal intensity measurement scheme. See 17 U.S.C. § 119(a)(8). Congress implemented this scheme as an alternative to litigation. See H.R.Rep. No. 103–703, at 14 (1994). WTVD made a challenge pursuant to this section in December 1994. The last subscribers PrimeTime terminated due to this challenge were terminated in August 1996. This amendment expired on December 31, 1996. Section 119(a)(5)(D), imposing upon the satellite carriers the burden of proving the eligibility of their subscribers, became effective on January 1, 1997. Throughout this period, ABC and its attorneys attempted to resolve their differences with PrimeTime. Having failed to do so, ABC filed suit on January 28, 1997. PrimeTime has failed to produce evidence to show that ABC unreasonably delayed assertion of its rights or that PrimeTime was prejudiced by the delay. This affirmative defense thus fails as a matter of law.

copyright infringement, the court must consider the scope of relief to which ABC is entitled. Because the relief necessary for PrimeTime's pattern or practice violation may moot ABC's requests for relief regarding PrimeTime's individual violations under Sections 119(a)(5)(A) and 119(a)(3), the court will first turn to the pattern or practice violation. PrimeTime contends that even if its arguments regarding waiver, estoppel, and unclean hands fail to bar equitable relief, the court should exercise its discretion and consider these arguments in fashioning a remedy, rather than granting the "draconian" pattern or practice injunction Congress provided in 17 U.S.C. § 119(a)(5)(B). This section provides that:

> If a satellite carrier engages in a willful or repeated pattern or practice of delivering a primary transmission made by a network station ... to subscribers who do not reside in unserved households, then ...

> (ii) if the pattern or practice has been carried out on a local or regional basis, the court shall order a permanent injunction barring the secondary transmission, for private home viewing in that locality or region, by the satellite carrier of the primary transmissions of any primary network station affiliated with the same network....

17 U.S.C. §§ 119(a)(5)(B) and (a)(5)(B)(ii).[6]

### A. *Congressional Abrogation of Equitable Discretion*

A threshold question exists as to whether a district court has any discretion in shaping an equitable remedy after finding a defendant to have engaged in a pattern or practice of willful or repeated violations of SHVA's white area restriction. A court should first look to the text of the statute in order to answer this question. The statute provides that the court "shall" enter a permanent injunction upon finding a pattern or practice of willful or repeated violations. The use of

the mandatory term "shall" "normally creates an obligation impervious to judicial discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* —— U.S. ——, ——, 118 S.Ct. 956, 962, 140 L.Ed.2d 62 (1998). *See also Black's Law Dictionary* 1233 (5th ed.1979) (when used in statutes, "shall" is generally imperative or mandatory). *But see also* Bryan A. Garner, *A Dictionary of Modern Legal Usage,* 939–40 (2d ed.1995) (although "shall" most commonly denotes a mandatory action, inconsistent use of the word has blurred its meaning).

The structure of the statute reinforces the conclusion that the normal meaning of the word "shall" applies in this case. Section 119(a)(5)(A) states that individual acts of infringement are "fully subject to the remedies provided by section[ ] 502.". Section 502 states that a court having jurisdiction over a copyright dispute "*may* ... grant temporary and final injunctions on such terms as it may deem reasonable." 17 U.S.C. § 502(a) (emphasis added). For the more egregious pattern or practice violation, however, Section 119(a)(5)(B)(ii) provides that the court "shall" enter a permanent injunction. This distinction strongly suggests the use of the word "shall" in Section 119(a)(5)(B)(ii) reflects a deliberate choice. More importantly for this analysis, Congress was also specific about the form of the injunctive relief the court must enter: "A permanent injunction barring the secondary transmission, for private home viewing in that locality or region, by the satellite carrier of the primary transmissions of any primary network station affiliated with the same network." 17 U.S.C. § 119(a)(5)(B)(ii). The specification of the necessary remedy supports the conclusion that a district court must enter this injunction upon finding a satellite carrier to have engaged in a pattern or practice violation.

PrimeTime argues that notwithstanding SHVA's use of the mandatory term "shall," the court retains equitable discretion as to

---

6. Congress has defined "primary transmission" to mean a transmission made to the public by a transmitting facility whose signals are being received and further transmitted by a secondary transmission service. *See* 17 U.S.C. § 119(d)(4); 17 U.S.C. § 111(f). "Secondary transmission" refers to the further transmission of a primary transmission simultaneously with the primary transmission. *See* 17 U.S.C. § 119(d)(7); 17 U.S.C. § 111(f). "Primary network station" means a network station, like WTVD, that broadcasts or rebroadcasts the basic programming service of a national network. *See* 17 U.S.C. § 119(d)(3).

the scope of the proper remedy. In support of this argument, PrimeTime relies heavily on *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944). The Supreme Court in *Hecht* recognized the long history of the equity courts' power to craft each decree to fit the particulars of each case. In light of this long history and tradition, a congressional intent to eliminate equitable discretion must be clear and unequivocal. *Id.* 321 U.S. at 329–30, 64 S.Ct. 587.

The statute at issue here is distinguishable from the Emergency Price Control Act ("EPCA") construed by the Supreme Court in *Hecht.* The EPCA provided that upon a showing that the defendant had engaged or was about to engage in acts or practices that violate the Act, " 'a permanent or temporary injunction, restraining order, or other order shall be granted without bond.' " *Id.* 321 U.S. at 322, 64 S.Ct. 587. The question presented to the Supreme Court was whether the government was entitled as of right to an injunction or whether the court had some discretion to grant or withhold such relief. The Court held that the statute did not remove judicial discretion. In so ruling, the Court relied upon three factors. First, the plain text of the EPCA left room·for the exercise of discretion insofar as it required the court to grant " 'a permanent or temporary injunction, restraining order, or other order.' " *Id.* 321 U.S. at 328, 64 S.Ct. 587 (emphasis added). After providing an example of an "other order" consistent with the purpose of the statute, the Court concluded that a court clearly had the power to choose whether the injunctive relief or the "other order" would be more appropriate to address the evil at hand. *Id.* Second, the legislative history was ambiguous as to whether or not courts had discretion to decline injunctive relief. Although some selections from the Senate Report suggested courts lacked discretion, another selection stated that courts were given jurisdiction " 'to issue whatever orders to enforce compliance is proper in the circumstances of each particular case.' " *Id.* 321 U.S. at 329, 64 S.Ct. 587 (quoting S.Rep. No. 931, 77th Cong., 2d Sess., p. 10). The ambiguity of the text and in the legislative history required the Court to turn to the long history of judicial discretion in equity jurisprudence.

We are dealing here with the requirements of equity practice with a background of several hundred years of history. Only the other day we stated that 'An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity.' The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied.

*Id.* 321 U.S. at 329–30, 64 S.Ct. 587 (citation omitted). The Court also noted that the EPCA governed procedure in state courts as well as federal courts because the former had concurrent jurisdiction with the latter in civil enforcement proceedings. In light of the historical preference for discretion and a perceived federalism problem arising from congressional limitations on the equity jurisdiction of state courts, the Court concluded that "if Congress [had] desired to make such an abrupt departure from traditional equity practice[,] . . . it would have made its desire plain." *Id.* 321 U.S. at 330, 64 S.Ct. 587.

Unlike the situation in *Hecht,* Congress here has made it quite plain that federal district courts lack discretion in fashioning equitable relief. The best indication of legislative intent is the plain text of the statute itself. As mentioned *supra,* the mandatory meaning of "shall" is made plain by contrast with congressional use of permissive language to provide the possibility of injunctive relief for individual violations that do not amount to a pattern or practice. The fact that SHVA delineates in specific terms the scope of the injunction a district court must issue unambiguously shows a legislative intent to abrogate equitable discretion. Unlike the case in *Hecht,* the legislative history here

reflects no contrary intent. *See* H.R.Rep. No. 100–887(I), at 18 (1988) ("If the satellite carrier engages in a willful or repeated pattern or practice of violations, the court shall issue a permanent injunction barring the secondary transmission by the satellite carrier of the primary transmission of any network station affiliated with the same network. The injunction would be applicable within the geographical area within which the violation took place—whether local, regional, or national."); H.R.Rep. No. 100–887(II), at 21 (1988) (same). Finally, this suit is one for copyright infringement arising under the federal Copyright Act. Subject matter jurisdiction therefore lies exclusively in federal court. *See* 28 U.S.C. § 1338(a). Any federalism concern perceived by the Court in *Hecht* is thus not présent in this case.[7]

Congressional intent to abrogate equitable discretion with respect to the remedy for a pattern or practice violation of SHVA is plain and unambiguous. There is no reason to require anything more from Congress, such as an unambiguously clear statement in the text of the statute, in order for the court to act upon this intent. Clear statement rules requiring the use of "magic words" in the text of a statute make sense only when Congress regulates in an area in which constitutional values are protected by the political process rather than by judicial review. *See, e.g., Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 552, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (in the context of generally applicable federal laws regulating both states and private persons, state sovereign interests are protected by "procedural safeguards inherent in the structure of the federal system" rather than by "judicially created limitations on federal power") and *Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (stating that if Congress intends to alter the traditional balance between the states and the federal government, "it must make its intention to do so

unmistakably clear in the language of the statute") (internal quotation marks omitted).

No such constitutional values are at stake here. The Constitution commits to Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. In the exercise of that authority, Congress passed the Copyright Act of which SHVA is a part. If Congress can create the right, it follows that it can also create the remedy. Furthermore, Article III affords Congress the power to restrict the equity jurisdiction of the lower federal courts. *See Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 330, 58 S.Ct. 578, 82 L.Ed. 872 (1938) (upholding the Norris–LaGuardia Act's prohibition on federal court jurisdiction to issue an injunction in any case growing out of a labor dispute); *cf. Glidden Co. v. Zdanok*, 370 U.S. 530, 557, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962) (plurality opinion) (stating that separation of powers principles do not prohibit Congress from limiting the federal courts remedial powers to damages rather than injunctive relief).

The plain meaning of Section 119(a)(5)(B)(ii) is that upon finding a pattern or practice violation, a district court must issue the specified permanent injunction. Congress has clearly abrogated the district courts' equitable discretion to fashion a remedy for a satellite carrier's pattern or practice violation. Accordingly, the equitable defenses that PrimeTime raises are of no consequence.

### B. *Scope of the Injunction*

■ Congress has specified that if a satellite carrier's pattern or practice violation has been carried out on a local or regional basis, the court must issue a permanent injunction barring the defendant from the secondary transmission, for private home viewing in that locality or region, of the primary

---

7. PrimeTime also cites *Board of Governors of Fed. Reserve Sys. v. DLG Fin. Corp.*, 29 F.3d 993 (5th Cir.1994), *Director, OTS v. Lopez*, 960 F.2d 958 (11th Cir.1992), and *S.E.C. v. Unifund SAL*, 910 F.2d 1028 (2d Cir.1990), each of which relied upon *Hecht* to find that seemingly mandatory statutes did not abrogate equitable discretion.

PrimeTime's reliance upon these cases is misplaced. Like *Hecht,* they are distinguishable because the statutes at issue did not specify the particular injunction that the court must issue. The specification of a particular injunctive remedy constitutes an unequivocal statement of intent to eliminate equitable discretion.

transmissions of any primary network station affiliated with the same network. *See* 17 U.S.C. § 119(a)(5)(9)(ii). It is clear that, for the purposes of this lawsuit, the relevant geographic area is WTVD's predicted Grade B contour. The legislative history to SHVA's 1994 amendments clearly endorses the predicted Grade B contour as the measure of the relevant geographic area. *See* H.R.Rep. No. 103–703, at 15 (1994) ("[F]or purposes of establishing a pattern or practice violation carried out on a local basis under § 119(a)(5)(B), the only relevant area is the network station's predicted Grade B contour."); *id.* ("The only appropriate area [for a pattern or practice violation within a locality] is the predicted Grade B contour of the network station at issue."). Furthermore, the parties' evidence and argument treated WTVD's predicted Grade B contour as the relevant geographic area. *See* Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. at 1; Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 4, 7 n. 6, 13, and 17; Def.'s Trial Br. at 3 n. 4, 10, 16 n. 7, and 23 n. 27; Def.'s Proposed Findings of Fact and Conclusions of Law at 8, 9, 18 n. 6, and 25 & n. 16. The geographic scope of the court's injunction will therefore cover the area within WTVD's predicted Grade B contour.

The court will therefore follow Section 119(a)(5)(B)(ii) and enjoin PrimeTime from the secondary transmission, for private home viewing within WTVD's predicted Grade B contour, of the primary transmissions of any primary network station affiliated with ABC. Pursuant to Fed.R.Civ.P. 65(d), this injunction will bind not only PrimeTime, but also its officers, agents, servants, employees, and attorneys, and those persons or entities in active concert or participation with Prime-Time who receive actual notice of the order. ABC's request for injunctions requiring PrimeTime to comply with SHVA in transmitting broadcast programming to subscribers in this local market and to provide the required subscriber information are made unnecessary by the court's order prohibiting PrimeTime from transmitting such programming. These requests for injunctive relief are therefore moot.

## CONCLUSION

For the foregoing reasons and those stated in this court's memorandum opinion of July 16, 1998, the court finds that there is no genuine dispute of material fact and that ABC is entitled to (1) judgment as a matter of law, and (2) a permanent injunction barring PrimeTime from transmitting ABC network programming within WTVD's local market.

An order and judgment will be entered contemporaneously herewith.

## ORDER, JUDGMENT, and PERMANENT INJUNCTION

For the reasons stated in the memorandum opinion issued on July 16, 1998, and the memorandum opinion issued contemporaneously herewith, IT IS HEREBY ORDERED AND ADJUDGED that the motion for summary judgment by Plaintiff ABC [Doc. # 37] is **GRANTED**.

The court has found that no reasonable fact finder could fail to find that Defendant PrimeTime has engaged and continues to engage in a willful or repeated pattern or practice, within the local market of ABC's local affiliate WTVD, of delivering primary transmissions made by a network station to subscribers that are not eligible to receive such service under the Satellite Home Viewer Act, 17 U.S.C. § 119. IT IS THEREFORE FURTHER ORDERED, ADJUDGED AND DECREED that Defendant PrimeTime, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with Prime-Time are hereby **PERMANENTLY ENJOINED AND RESTRAINED** from the secondary transmission, for private home viewing within WTVD's local market, of the primary transmission of any primary network station affiliated with ABC. For the purpose of this permanent injunction, the following definitions apply. "Secondary transmission" is defined as the further transmission of a primary transmission simultaneously with that primary transmission. "Primary transmission" is defined as a transmission made to the public by a transmitting facility whose signals are being received and

further transmitted by a secondary transmission service. *See* 17 U.S.C. §§ 119(d)(4), (d)(7), and 17 U.S.C. § 111(f). "Local market" is defined as the area encompassed within a network station's predicted Grade B contour. *See* 17 U.S.C. § 119(d)(11). In this case, WTVD's predicted Grade B contour is a circular area with a radius of 75 miles emanating from the base of WTVD's transmitting tower located adjacent to Highway 70 approximately five miles east of Garner, North Carolina. "Primary network station" is defined as a network station that broadcasts or rebroadcasts the basic programming service of The ABC Television Network. *See* 17 U.S.C. § 119(d)(2), (d)(3).